## KOSA v STATE TREASURER

Docket Nos. 60701, 60712. Argued November 15, 1978 (Calendar Nos. 11, 12).—Decided May 27, 1980.

Mary Kay Kosa, a member of the Michigan Public School Employees' Retirement System, and others brought an action in the Court of Appeals for a writ of mandamus against the State Treasurer, the Legislature, and other state officials to compel the defendants to fund the Michigan Public School Employees' Retirement System for the fiscal years 1974-1975 and 1975-1976 under the applicable constitutional and statutory provisions. The Court of Appeals, D. F. Walsh, P.J., and Quinn and Stair, JJ., granted a writ of mandamus to prohibit the use of current service monies to pay the unfunded accrued liabilities of the retirement system, but held, in a per curiam opinion, that the courts could not compel the Legislature to appropriate additional funds (Docket No. 27412). After the·parties applied for leave to appeal, the Legislature enacted 1977 PA 275, which retroactively changed the accounting method for the retirement system sufficiently to remedy the underfunding complained of. The parties appeal. *Held:*

1. The Michigan Public School Employees' Retirement Board violated the Constitution by "borrowing" from funded reserves for retirement liabilities accrued after the Constitution of 1963 to pay retirement benefits to public school employees who rendered their service before the Constitution was adopted. Although the board acted altruistically in meeting the needs of the retirees through its "borrowing" scheme, it directly violated the specific constitutional language that "such funding shall not be used for financing unfunded accrued liabilities". The Court of Appeals, therefore, correctly held the action of the board to be illegal and subject to mandamus.

2. Until the adoption of the Constitution of 1963, legislative

REFERENCES FOR POINTS IN HEADNOTES

[1, 7] 52 Am Jur 2d, Mandamus §§ 166, 241, 384.

60 Am Jur 2d, Pensions and Retirement Funds, § 65.

[2] 60 Am Jur 2d, Pensions and Retirement Funds §§ 39, 42, 65.

[3-5] 60 Am Jur 2d, Pensions and Retirement Funds § 46 *et seq.*

[4-6] 60 Am Jur 2d, Pensions and Retirement Funds § 65 *et seq.*

appropriation for retirement fund reserves was considered to be an *ex gratia* action, and the most that could be said about it was that there was an implied commitment to fund pension reserves. Because the Legislature was under no constitutional obligation to fund retirement reserves at a given level, it did not violate the Constitution by failing to do so, and there is no need to address whether there is a legal remedy.

3. The plaintiffs argue that retrospective reallocation, by changing the actuarial method of calculating reserves, of previously appropriated current service monies impairs the obligation of contract in contravention of the Michigan and United States Constitutions. The Constitution of 1963 provides that the "accrued financial benefits" of a public retirement system are a contractual obligation of the retirement system. "Accrued financial benefits" means the right to receive certain pension payments upon retirement, based upon service performed. A clear distinction must be drawn between the right to receive pension benefits and the funding method adopted by the Legislature to assure that monies are available for the payment of such benefits. This case does not involve the right of public employees to receive pension payments as they become due. There is no dispute that full pension payments are being or will be timely made, and therefore there is no impairment of contract involved. Both the former "attained age" and present "entry age normal" methods of funding are generally accepted and actuarially sound, and they provide equivalent reserves for payment of pension benefits. Even if the constitutional prohibition on impairing the obligation of contracts also applies to the method of funding, there would be no impairment of the contractual obligation because the new method supports the benefit structure as strongly as the method it replaced.

4. The plaintiffs concede that the defendants could have originally used the "entry age normal" method for post-1963 current service funding without violating the Constitution, but argue that retrospective adoption of that method permits the defendants to violate the constitutional prohibition against payment of unfunded accrued liabilities with "current service" monies. The 1977 amendment accomplished exactly the relief which the plaintiffs have requested from the Court pursuant to its equitable powers, to require the Legislature to replace the "borrowed" funds, in installments if necessary. The retrospective reallocation of previously appropriated current service monies did not violate the Constitution, because the Legislature merely transferred credits to validate actions already taken by the Michigan Public School Employees' Retirement Board. The

effect of the 1977 amendment is to restore pension reserves after a period of years, which renders it unnecessary to consider whether mandamus will lie to induce restorative legislative appropriations.

5. After the passage of the 1977 amendment the burden of proof shifted to the defendants, who claim that all constitutional funding requirements have been satisfied by the amendment, to show that all requirements have been met, including rectifying any previous unconstitutional diversions or underfunding. The evidence concerning the extent of the underfunding alleged is not contained in the record or in the answers to questions which the Court has submitted to the parties. Therefore, the Court remanded the case to the Court of Appeals to make findings of fact and to provide any appropriate relief.

The decision of the Court of Appeals is affirmed in part, but its order of mandamus is vacated because it was rendered moot by the enactment of 1977 PA 275 and the case is remanded to the Court of Appeals.

78 Mich App 316; 259 NW2d 463 (1977) affirmed.

1. CONSTITUTIONAL LAW — SCHOOLS AND SCHOOL DISTRICTS — PUBLIC RETIREMENT SYSTEMS — FUNDING — MANDAMUS — ADMINISTRATIVE LAW.

The Michigan Public School Employees' Retirement Board violated the constitutional provisions for the funding of its retirement system by "borrowing" from funded reserves for retirement liabilities accrued after the Constitution of 1963 to pay retirement benefits to public school employees who rendered service before the Constitution of 1963 was adopted; the Court of Appeals therefore correctly held the actions of the board, which used current service monies to pay unfunded accrued liabilities, to be subject to mandamus (Const 1963, art 9, § 24).

2. CONSTITUTIONAL LAW — PUBLIC RETIREMENT SYSTEMS — FUNDING — APPROPRIATIONS.

Legislative appropriation for public employees' retirement systems' reserves, until the adoption of the Constitution of 1963, was considered to be an *ex gratia* action; the most that could be said about it was that there was an implied commitment to fund public pension reserves, but the Legislature did not violate the former Constitution by failing to do so at a certain level (Const 1963, art 9, § 24).

3. CONSTITUTIONAL LAW — PUBLIC RETIREMENT SYSTEMS — ACCRUED FINANCIAL BENEFITS — WORDS AND PHRASES.

The constitutional term "accrued financial benefits" of a public

retirement system means the right to receive certain pension payments upon retirement, based upon service performed (Const 1963, art 9, § 24).

4. CONSTITUTIONAL LAW — PUBLIC RETIREMENT SYSTEMS — ACCRUED FINANCIAL BENEFITS — FUNDING — IMPAIRMENT OF CONTRACTS.

A clear distinction must be drawn between the right to receive public pension benefits under the Constitution of 1963 and the funding method adopted by the Legislature to assure that monies are available for the payment of such benefits; there is no impairment of contract involved where the obligation for payment of public pension benefits as they become due has been fully met, and the plaintiffs who are challenging the Legislature's method of funding make no substantial claims that it will not continue to be met (Const 1963, art 1, § 10; art 9, § 24).

5. CONSTITUTIONAL LAW — SCHOOLS AND SCHOOL DISTRICTS — PUBLIC RETIREMENT SYSTEMS — ACCRUED FINANCIAL BENEFITS — FUNDING — IMPAIRMENT OF CONTRACTS.

There is no impairment of a contractual obligation to pay "accrued financial benefits" from the Michigan Public School Employees' Retirement System, even if that obligation is related to the method of funding the retirement system, where the Legislature retroactively substitutes the "entry age normal" method of funding for the "attained age" method, because the new method supports the pension benefit structure as strongly as the method it replaces (Const 1963, art 1, § 10; art 9, § 24; 1977 PA 275).

6. CONSTITUTIONAL LAW — PUBLIC RETIREMENT SYSTEMS — FUNDING — SEPARATION OF POWERS.

The first dependence of public retirement systems beneficiaries for funding the public retirement systems is on the sense of fairness and justice and the constitutional obligation of the Legislature, rather than the courts, in light of the constitutional separation of powers (Const 1963, art 3, § 2; art 9, § 24).

7. CONSTITUTIONAL LAW — MANDAMUS — ADMINISTRATIVE LAW.

The courts can and will issue writs of mandamus to the executive branch of government to enforce rights conferred by the Constitution of 1963.

*Foster, Swift, Collins & Coey, P.C.* (by *James A. White, Karen Bush Schneider,* and *Peter F. Mc-Nenly),* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Gerald F. Young,* Assistant Attorney General, for defendants.

WILLIAMS, J. This case presents a political problem seeking judicial resolution. To gain protection of their pension rights, Michigan teachers effectively lobbied for a constitutional amendment granting contractual status to retirement benefits. When it appeared that the constitutional guarantee might be impaired, the teachers turned to the courts for assistance. That litigation, culminating in a Court of Appeals decision, led to a legislative effort for a political solution. We are called upon to review this action.

The background is complex and confusing. However, the following encapsulates the significant factors:

(1) For years teachers' pensions were inadequate because they were based on unconscionably low salaries and employee contributions premised thereon. Retirement security has been further eroded because of the rise in the cost of living due to inflation.

(2) Even after the Legislature began assuming responsibility for contributions to the teachers' retirement fund, pension security was jeopardized because the Legislature did not always make adequate appropriations to fund the reserves to pay pension benefits. By the time of the 1961 Constitutional Convention, this underfunding amounted to about 600 million dollars.[1]

(3) Provision was made in the 1963 Constitution to make pension benefit payments contractual obligations and to require adequate annual appropriations to the pension fund. Const 1963, art 9, § 24.

[1] 1 Official Record, Constitutional Convention 1961, p 770.

(4) In each fiscal year from 1963 until 1974, the Legislature appropriated adequate sums to meet anticipated post-constitution (hereinafter "post-con") retirement reserve requirements. The Legislature failed, however, to make adequate appropriation for the pre-constitution (hereinafter "pre-con") accrued retirement liabilities.[2]

(5) In each fiscal year from 1963 until 1974, the reserves collected under the "pre-con" retirement system were sufficient to pay "pre-con" retirement benefits.

(6) In 1972 and 1974, the Legislature increased benefits for both "pre-con" and "post-con" retirants.[3]

(7) From fiscal 1974-1975 to 1976-1977, when the "pre-con" reserves were exhausted, the Michigan Public School Employees' Retirement System (hereinafter MPSERS) "borrowed" from the "post-con" reserves to pay "pre-con" liabilities.

(8) On February 2, 1976, "pre-con" and "post-con" retirees and current MPSERS members sought equitable relief from this "borrowing" of "post-con" reserves to meet "pre-con" liabilities, filing a Complaint for Mandamus in the Court of Appeals.[4]

---

[2] Throughout this opinion, "pre-con" and "post-con" are used to describe the retirement system and reserves which existed before and after the 1963 Constitution, which made the pension plans and retirement systems of the state and its political subdivisions contractual obligations. Although we refer to the "pre-con" accrued benefits as "unfunded", in fact these benefits were partially paid after adoption of the 1963 Constitution through reserves accumulated prior to the 1963 Constitution, through appropriations in excess of the annual "current service" contribution (see fn 12, *infra),* and through investment income. However, no systematic scheme of legislative funding was adopted to meet these "pre-con" pension obligations until passage of 1977 PA 275.

[3] 1972 PA 258, § 174; MCL 388.1274; MSA 15.1919(674). 1974 PA 244; MCL 38.227d; MSA 15.893(27d).

[4] The references to "pre-con" and "post-con" retirees are made to

(9) The Court of Appeals ruled that the MPSERS' "borrowing" was illegal and subject to mandamus. The Court additionally ruled, however, that mandamus would not lie against the Legislature to compel compensating appropriations.[5]

(10) Thereafter, the Legislature belatedly sought to correct prior funding deficiencies through enactment of 1977 PA 275,[6] which retroactively substituted the "entry age normal" system of accounting for the previous "attained age" system.[7] Since the new system required a lower level of initial reserves than the former system, an excess of funds was created, approximately 475 million dollars, more than sufficient to restore the 460 million dollars "borrowed" from the "post-con" reserves.[8]

simplify the factual situation; the majority of "post-con" MPSERS members and retirees accumulated service credit both before and after the 1963 Constitution.

[5] 78 Mich App 316, 318; 259 NW2d 463 (1977), *reh den.*

[6] MCL 38.227(2); MSA 15.893(27)(2) and MCL 38.345(2); MSA 15.893(85)(2).

[7] From the effective date of the 1963 Constitution through the effective date of 1977 PA 275, the MPSERS appropriations relied upon the "attained age" method of actuarial valuation. This method requires a relatively high level of contributions in the early years of a retirement plan. In 1977 PA 275, however, the Legislature retroactively adopted the "entry age normal" method of accounting. Legislative appropriations during the 1964-1977 period, premised on the "attained age" method, greatly exceeded contributions calculated under the retroactive funding system. Consequently, according to the new "entry age normal" system, the MPSERS was "overfunded" to the extent of the excess contributions mandated by the former actuarial system. This excess was devoted to discharging the unfunded accrued liabilities of the MPSERS; the act itself provides financing for unfunded accrued liabilities for the 1977-1978 fiscal year.

[8] The defendants allege and the plaintiffs have not contested that the dollar difference between the attained age and entry age methods of actuarial valuation amounts to 475 million dollars. Defendants-Appellees' Brief, p 7. The total amount of current service money used to pay unfunded accrued liabilities for the fiscal years 1974-1975 through 1977-1978 for both Chapters I and II is $459,618,725.86. Thus, as far as these figures are concerned, the deficit was liquidated. Letter to James A. White, Foster, Swift, Collins & Coey, from Attorney General Frank J. Kelley, Assistant Attorney General Gerald F. Young and Norvel A. Hansen, Deputy Director, Bureau of Retirement Systems, dated November 30, 1978.

The foregoing facts raise five issues:

I. Did the MPSERS Board violate Const 1963, art 9, § 24 by "borrowing" from "post-con" funded reserves to pay "pre-con" retiree benefits? Further, did the Court of Appeals correctly rule that a writ of mandamus might issue to terminate that "borrowing"? The answer to both questions is yes.

II. Did the Legislature violate the Constitution by underfunding the "pre-con" reserves? The answer to this question is no.

III. Did the Legislature, through its passage of 1977 PA 275, violate the constitutional proscription against impairment of contracts, Const 1963, art 9, § 24 and art 1, § 10? The answer to this question is no.

IV. Did the Legislature, through its passage of 1977 PA 275, violate the constitutional prohibition that "post-con" current service "funding shall not be used for financing unfunded accrued liabilities", *i.e.,* "pre-con" retirement benefits, Const 1963, art 9, § 24? Can this Court by mandamus require the Legislature to refund the "post-con" current service monies used to defray "pre-con" unfunded accrued liabilities? The answer to the first question is no. The second question is moot.

V. Did 1977 PA 275 satisfy (a) constitutional funding and (b) the prayers in plaintiffs' complaint? If not, what can this Court do to give relief? The answer to both questions is that there is insufficient data in the record to resolve these questions and that this Court is remanding the matter to the Court of Appeals to establish the necessary data.

## FACTS

This action for mandamus was initially com-

menced in the Court of Appeals on February 2, 1976. 78 Mich App 316; 259 NW2d 463 (1977), reh den.[9] Plaintiffs alleged, inter alia, that defendants were misapplying "post-con" funded reserves[10] to pay "pre-con" unfunded accrued liabilities,[11] contrary to Const 1963, art 9, § 24, which provides:

"The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

"Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."

More specifically, plaintiffs contended that these "post-con" monies were appropriated by the Legislature only to cover the annual contributions, or "current service"[12] monies, made to MPSERS on behalf of currently employed MPSERS members. The "post-con" monies could not legally be utilized to meet MPSERS "pre-con" unfunded accrued liabilities.[13]

---

[9] Rehearing was denied by an unpublished order, November 2, 1977 (Docket No. 27412).

[10] The amount involved for the 1974-1978 fiscal years is $459,618,725.86. See fn 8, supra.

[11] "Unfunded accrued liabilities" are the estimated amounts which will be needed according to actuarial projections to fulfill presently existing pension obligations other than those funded by current service appropriations; they arise from the state's failure to make adequate annual contributions to the retirement fund for service credit and post-retirement benefits. Unfunded accrued liabilities include monthly benefit payments to eligible recipients.

[12] "Current service" is used throughout this opinion in conjunction with "monies" when referring to the annual legislative appropriations required on behalf of currently employed MPSERS members to fund the retirement benefit credits accruing during that year, and with "reserves" when referring to the funds which are built up through the annual deposit of such appropriations.

[13] Const 1963, art 9, § 24, ¶ 2. See also 1969-1970 OAG, No 4656, p 90 (October 17, 1969), which reaches the same result.

In years prior to the Constitution of 1963, the Legislature did not always make adequate appropriations to maintain the MPSERS on an actuarially sound basis. At the time of the 1961 Constitutional Convention, the unfunded accrued liabilities of the MPSERS exceeded reserves by approximately 600 million dollars.[14] The practical effect of this underfunding was that many pensioners had accumulated years of service for which insufficient money had been set aside in the pension reserve funds to pay the benefits to which their years of service entitled them.[15] These pensioners sought relief in the 1961 Constitutional Convention and achieved Const 1963, art 9, § 24.

Following the adoption of the 1963 Constitution, the MPSERS Board commenced using the "attained age" method of valuation to determine the amount of the state's contribution to MPSERS.

The Legislature has, in recent years, supplemented the retirement income for previously retired members of the MPSERS. 1972 PA 258, § 172; MCL 388.1272; MSA 15.1919(672) set, with restrictions, a $3,000 yearly minimum retirement

---

[14] See fn 1, *supra.*

[15] Understanding of the present controversy is facilitated by a précis of the statutory pattern established by the Legislature for the funding of public school employees' retirement benefits. The maiden effort, 1915 PA 174, required employees to make contributions which were disbursed upon retirement in a series of fixed, equal payments for the life of the annuitant. That act was succeeded by 1929 PA 5, 1933 PA 34, and 1937 PA 184. The last, 1937 PA 184, injected a non-contributory element into the disbursement system, and provided an annual legislative appropriation of $325,000 from the general fund for the payment of annuities and pensions for MPSERS members. There followed 1939 PA 56, 1941 PA 56 and 1941 PA 163 and finally the present retirement statute, 1945 PA 136, as amended, MCL 38.201 *et seq.;* MSA 15.893(1) *et seq.* Since 1974, the system has been entirely non-contributory; annual appropriations to the present retirement system are made by the Legislature alone. 1974 PA 244; MCL 38.221; MSA 15.893(21). The most recent appropriation for fiscal 1979-1980 was 453 million dollars out of a budget of approximately 8 billion dollars.

benefit for pre-1956 retirants. In 1972 the Legislature increased the retirement allowances for members who had retired between 1956 and 1971 by between 1% and 15%, depending upon how long ago the member retired. 1972 PA 258, § 174; MCL 388.1274; MSA 15.1919(674). The Legislature further increased retirement allowances for members who retired between 1956 and 1973 by between 1% and 17% in MCL 38.227d; MSA 15.893(27d). 1974 PA 244.

Until 1974, deficiencies in appropriations for "pre-con" retirees were met through disbursement of funds which had been accumulated in the retirement system prior to the effective date of the 1963 Constitution. These "pre-con" reserves were exhausted in the 1974-1975 fiscal year. The MPSERS Board was therefore without adequate funds to pay the benefits due approximately 45,000 retirees and beneficiaries with "pre-con" service.[16] Rather than making partial benefit payments to retirees with only "pre-con" benefit entitlement, the MPSERS Board in effect extralegally "borrowed" $459,618,725.86 from the "post-con" current service reserves, and made monthly pension payments out of these funds. If the board had not done this, the retirement payroll would have been reduced by 69% with the major burden falling on the oldest retirees.

Under these circumstances, plaintiffs, both "pre-con" and "post-con" retirees and presently working MPSERS members, brought this suit. On September 12, 1977, the Court of Appeals held that a writ of mandamus would issue, requiring the de-

---

[16] The number of retirees and beneficiaries is an estimate, since no other figure is available. The 45,000 appears in the defendants' application for rehearing and refers to 1977, not 1975. The same is true of the 69% figure. However, the 1975 figure is probably fairly close to the 1977 figure and at least helps illustrate the problem.

fendant MPSERS Board to cease, as unconstitutional, the use of MPSERS "post-con" funded reserves to defray "pre-con" unfunded accrued liabilities. It declined, however, to order the Legislature to appropriate compensating funds to the MPSERS. 78 Mich App 316; 259 NW2d 463 (1977), *reh den.*

Because legislation responding to plaintiffs' prayer was pending, defendants requested rehearing to delay the effective date of the Court of Appeals writ to March 31, 1978. Rehearing was denied.

Both plaintiffs and defendants subsequently filed applications for leave to appeal in this Court. Shortly thereafter, however, defendants applied for dismissal of their application, asserting that the issues raised therein were rendered moot by the December 15, 1977 enactment of 1977 PA 275, MCL 38.227(2); MSA 15.893(27)(2) and MCL 38.345; MSA 15.893(85).[17]

This Court granted both plaintiffs' and defendants' applications for leave to appeal. Oral argument was held on November 15, 1978.

## QUESTION I. DID THE MPSERS BOARD VIOLATE THE CONSTITUTION?

Question I is "Did the MPSERS Board violate Const 1963, art 9, § 24 by 'borrowing' from 'post-con' funded reserves to pay 'pre-con' retiree benefits?" While the MPSERS Board acted altruistically in meeting the urgent needs of the "pre-con" retirees through its "borrowing" scheme,[18] the

---

[17] Although defendants did not concurrently request the Court to dismiss plaintiffs' application for leave to appeal, their brief in opposition implicitly sets forth that demand.

[18] The MPSERS Board probably was between the devil and the deep blue sea. On the one hand, it had a practical problem: it had no "pre-

board directly violated the specific language of Const 1963, art 9, § 24, which reads in pertinent part as follows: "* * * such funding ["post-con" reserves] shall not be used for financing ["pre-con"] unfunded accrued liabilities".

The second part of Question I is "Did the Court of Appeals correctly rule that a writ of mandamus might issue * * *?" The Court of Appeals correctly held the MPSERS Board's "borrowing" illegal and therefore subject to mandamus. We affirm both actions. However, for reasons subsequently to be discussed, we vacate the order allowing mandamus in the nature of a writ of prohibition since the reason for that order was rendered moot by the enactment of 1977 PA 275, *i.e.,* the Legislature has appropriated and indicated it will appropriate to cover "pre-con" benefits, thereby removing the occasion for the board to "borrow".

QUESTION II. *RE* LEGISLATIVE UNDERFUNDING OF "PRE-CON" RESERVES

Question II is "Did the Legislature violate the Constitution by underfunding the 'pre-con' reserves?" Until the adoption of Const 1963, art 9, § 24, legislative appropriation for retirement fund reserves was considered to be an *ex gratia* action.[19] Consequently, the most that could be said about

con" funds to pay "pre-con" retirees their benefits. On the other hand, it appeared to have a constitutional problem of major dimensions as Const 1963, art 9, § 24 protected "[t]he accrued financial benefits of each pension plan and retirement system" as a constitutional "contractual obligation * * * which shall not be diminished or impaired * * *". See defendants' application for rehearing, ¶ 6. Paying the "pre-con" retirees out of "post-con" current service reserves under these circumstances was from their point of view probably the lesser of two evils at that time.

[19] *Advisory Opinion re Constitutionality of 1972 PA 258,* 389 Mich 659; 209 NW2d 200 (1973); *Brown v Highland Park,* 320 Mich 108; 30 NW2d 798 (1948), citing *Attorney General v Connolly,* 193 Mich 499; 160 NW 581 (1916).

"pre-con" legislative appropriations for retirees was that there was some kind of implied commitment to fund pension reserves. Obviously, since the Legislature was under no constitutional obligation to fund "pre-con" retirement reserves at a given level, the Legislature did not violate the Constitution in failing to do so. Accordingly, there is no need to address whether a legal remedy might be involved.

### QUESTION III. DOES 1977 PA 275 IMPAIR A CONTRACT?

Question III is "Did the Legislature, through its passage of 1977 PA 275, violate the constitutional proscription against impairment of contract, Const 1963, art 9, § 24 and art 1, § 10?"

Plaintiffs argue that retrospective reallocation of previously appropriated current service monies impairs the obligation of contract in contravention of the Michigan and United States Constitutions.[20]

Plaintiffs' argument that retrospective reallocation is constitutionally impermissible must focus on the phrase "accrued financial benefits" found in Const 1963, art 9, § 24 which provides in pertinent part:

"The *accrued financial benefits* of each pension plan

---

[20] US Const, art I, § 10, states in pertinent part:

"No State shall * * * pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."

Const 1963, art 1, § 10, states:

"No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted."

Const 1963, art 9, § 24, states in pertinent part:     .

"The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."

and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." (Emphasis added.)[21]

The term "accrued financial benefits" was defined

---

[21] In drafting Const 1963, art 9, § 24, the constitutional framers did not intend to make any particular funding system contractually enforceable. In the debate on Committee Proposal 40, which became, as amended, Const 1963, art 9, § 24, the following colloquy between Delegates Downs, Brake and Van Dusen is instructive:

"[Mr. Downs:] The second question and the real question that I have is: if the legislative body does not appropriate enough money for proper funding, would there be any way for the employee or the employees' organization to compel the local unit of government, or whoever is responsible, to put aside enough money each year for the proper funding?

\* \* \*

"[Mr. Brake:] On the second part of your question, there is no way to compel the Legislature to appropriate money. \* \* \* We have to put some faith in somebody, and this is being put in the Legislature.

\* \* \*

"Mr. Van Dusen: Mr. Chairman, if I may elaborate briefly on Mr. Brake's answer to Mr. Downs' question, I would like to indicate that the words 'accrued financial benefits' were used designedly, so that the contractual right of the employee would be limited to the deferred compensation embodied in any pension plan, and that we hope to avoid thereby a proliferation of litigation by individual participants in retirement systems talking about the general benefits structure, or something other than his specific right to receive benefits. It is not intended that an individual employee should, as a result of this language, be given the right to sue the employing unit to require the actuarial funding of past service benefits, or anything of that nature. What it is designed to do is to say that when his benefits come due, he's got a contractual right to receive them.

"And, in answer to your second question, he has the contractual right to sue for them. So that he has no particular interest in the funding of somebody else's benefits as long as he has the contractual right to sue for his.

\* \* \*

"Mr. Downs: I appreciate Mr. Van Dusen's comments. Again, I want to see if I understand this. Then he would not have a remedy of legally forcing the legislative body each year to set aside the appropriate amount, but when the money did come due this would be a contractual right for which he could sue a ministerial officer that could be mandamused or enjoined; is that correct?

"Mr. Van Dusen: That's my understanding, Mr. Downs." 1 Official Record, Constitutional Convention 1961, pp 773-774.

by this Court in *Advisory Opinion re Constitutionality of 1972 PA 258,* 389 Mich 659, 662-663; 209 NW2d 200 (1973), as the right to receive certain pension payments upon retirement, based upon service performed. Plaintiffs assert that their contractual rights to receive future pension payments have been impaired by the Legislature's retrospective adoption of the "entry age normal" funding system, because monies previously appropriated for current service—which plaintiffs label "accrued financial benefits"—have been reallocated to defray unfunded accrued liabilities.

A clear distinction must be drawn between the right to receive pension benefits and the funding method adopted by the Legislature to assure that monies are available for the payment of such benefits. It must be emphasized that this case does not involve the firmly established right of public employees to receive pension payments as those payments become due. In this case, that obligation has been fully met, and plaintiffs make no substantial claims that it will not continue to be met.

Since plaintiffs' arguments regarding impairment of contract stand or fall on whether "[t]he accrued financial benefits * * * [are] diminished or impaired", Const 1963, art 9, § 24, and since there is no dispute that full pension payments are being or will be timely made, we hold there is no impairment of contract involved.

While it is clear that the constitutional proscription against impairment of contract relates to "accrued financial benefits", and "accrued financial benefits" are not the same thing as the "system" of funding, we cannot say that there is no logical or historical connection between the two. It is logical that if appropriations to pension reserves are consistently less than payments of pension

benefits, the time will come when reserves will be exhausted. Such a history is presented by the facts of this very case inasmuch as, immediately subsequent to the adoption of the "post-con" retirement system, the Legislature began to underfund the "pre-con" system. The result was that in a few years the reserves for "pre-con" benefits had become exhausted, and the alleged raid on the "post-con" reserves was made.

*Arguendo,* let us examine the substitution of the entry age normal system for the attained age system as though the funding system were within the protection of the constitutional "contractual obligation * * * which shall not be diminished or impaired".

We are of the opinion, and plaintiffs concede, that both the former "attained age" and present "entry age normal" methods of funding are generally accepted and actuarially sound, and provide equivalent reserves for payment of pension benefits.[22] While the methods differ in their technical requirements, neither pension benefits nor long-

[22] "Although some actuaries may demur, it is our view that there is no formula that is the only 'correct' basis for actuarial funding. *The choice is a matter of policy.*

*     *     *

"Entry-age-normal funding [substituted system] is widely used. It comes closest of all the traditional methods to developing level contribution requirements * * *."

"The contribution requirement [for the original "attained age" method, a type of aggregate funding] may be comparatively high—more, in the typical case, than entry-age-normal with twenty-year amortization and certainly more than with twenty-five, thirty, or forty-year amortization. *The reserves accumulated may sometimes be more than the security considerations of a public system require.*

*     *     *

"* * * *Ultimately,* assuming that the [unfunded accrued] liability is amortized, *the contribution [for the original system] becomes the same as for entry-age-normal* [substituted system] or aggregate funding, *and so do the reserves."* (Emphasis added.) Tilove, *Public Employee Pension Funds* (NY: Columbia University Press, 1976), pp 142, 150, 158-159.

term reserves are effectively modified by the adoption of one funding system rather than the other. Thus, the signal feature of the instant substitution is that the reserves from which pension benefits will ultimately be paid under the "entry age normal" method are equal to those generated by the initially selected "attained age" funding system.

To sum up, while the Legislature's constitutional contractual obligation is not to impair "accrued financial benefits", even if that obligation also related to the funding system, there would be no impairment of the contractual obligation because the substituted "entry age normal" system supports the benefit structure as strongly as the replaced "attained age" system.

## QUESTION IV. DOES 1977 PA 275 VIOLATE CONST 1963, ART 9, § 24 BY USING CURRENT SERVICE FUNDS TO FINANCE UNFUNDED ACCRUED LIABILITIES?

Question IV is "Did the Legislature, through its passage of 1977 PA 275, violate the constitutional prohibition that 'post-con' current service 'funding shall not be used for financing unfunded accrued liabilities', i.e., 'pre-con' retirement benefits?"[23]

Plaintiffs concede that defendants could have originally used the "entry age normal" method for post-1963 current service funding without violating

---

[23] 1977 PA 275 provides in pertinent part:

"Appropriations made for current service in each fiscal year beginning with the fiscal year which began on July 1, 1964, which are in excess of the appropriations that would have been required under current year service contribution rates for that particular fiscal year using the entry age normal cost method of valuation * * * shall be used to finance the unfunded accrued service liability portion of retirement allowances effective after June 30, 1964, and to finance the unfunded accrued service liability portion of the retirement payroll of the retirement system * * *."

Const 1963, art 9, § 24.[24] Plaintiffs contend, however, that retrospective application of that method is indicative of financial irresponsibility, because the retrospective adoption essentially permits defendants to violate with impunity the constitutional prohibition against payment of unfunded accrued liabilities with current service monies.

The plaintiffs refer to the second paragraph of Const 1963, art 9, § 24, which reads:

"Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."

Plaintiffs focus on the last clause: "such funding shall not be used for financing unfunded accrued liabilities". This, of course, is the misfeasance charged against the MPSERS Board's so-called "borrowing", a charge we found valid.

Plaintiffs now raise the very interesting question whether, through its enactment of 1977 PA 275, the Legislature used current service "funding * * * for financing" "pre-con" retirement benefits contrary to Const 1963, art 9, § 24?[25]

Although 1977 PA 275 literally requires that "excess" "[a]ppropriations * * * shall be used to finance the unfunded accrued service liability * * *", it is clear that this legislation-created "excess" existed only on paper; rather than actually appropriating funds, the act merely evidences a paper transaction. In fact, the actual funds had been expended by action of the MPSERS Board during the 1974-1977 fiscal years. It therefore follows that the Legislature itself did *not* use

---

[24] Brief for Plaintiffs, p 31, top paragraph.

[25] Brief for Plaintiffs, p 31, bottom paragraph.

current service "funding * * * for financing" "pre-con" retirement benefits since the MPSERS Board had already done so. In effect, the reallocation prescribed by 1977 PA 275 merely *remedied* the actions previously taken by the board. Essentially, the act reclassified already expended funds and created a new actuarial system which would provide adequate funds to restore the current service reserves to constitutionally satisfactory levels.

The practical rather than literal impact of 1977 PA 275 is therefore dispositive. In effect, that act accomplished exactly what plaintiffs have requested this Court to undertake pursuant to its equitable powers, *i.e.,* to require the Legislature to replace the "borrowed" funds, in installments if necessary.[26] Although the substituted "entry age normal" system initially has smaller reserves than those required under the previous "attained age" system, its subsequent payments increase in size to the end that "entry age" reserves ultimately equal "attained age" reserves. In short, the larger later payments associated with the "entry age normal" system operate to restore the reserves in installments.

We find that the retrospective reallocation of previously appropriated current service monies did not violate Const 1963, art 9, § 24, ¶ 2, since the Legislature did not improperly expend current service funds, but merely transferred paper credits to validate actions already taken by the MPSERS Board. We hold, further, that the effect of 1977 PA 275 is to restore pension reserves to the *status quo* after a period of years. This restoration renders it

[26] Brief for Plaintiffs, p 59. The effect of adopting the "entry age normal" method of valuation is to pace deposits to the current service reserves in a manner different from that required by the former "attained age" method, with ultimate reserves equivalent to those which would accumulate under the previous accounting method.

unnecessary for us to consider the question whether mandamus will lie to induce restorative legislative appropriations.

QUESTION V. DID 1977 PA 275 SATISFY
CONSTITUTIONAL FUNDING AND PLAINTIFFS'
PRAYERS?

Passage of 1977 PA 275 drastically changed the focus of this case. Prior thereto plaintiffs had the burden of proof; subsequently the burden of proof shifted to defendants. According to plaintiffs' complaint for the fiscal years 1974-1975 and 1975-1976, the Legislature appropriated inadequate funds to cover both the "post-con" current service requirements and the "pre-con" unfunded accrued liabilities, *i.e.,* the "pre-con" benefit payments. Further, according to plaintiffs' brief the MPSERS Board "borrowed" from "post-con" current service reserves to pay "pre-con" benefits. Plaintiffs' burden was to establish these facts and the Court of Appeals opinion substantially agreed they had done so. With the passage of 1977 PA 275, defendants maintained that all constitutional funding requirements were now satisfied and that the constitutional *status* of MPSERS was restored. It therefore became defendants' procedural obligation in this case to prove that all constitutional funding requirements were met, including rectifying any previous extra-constitutional diversions or underfunding.

Plaintiffs, in making their proofs in the Court of Appeals, developed with defendants an agreed statement of facts, which plaintiffs state in their brief "contained within it a substantial amount of the data necessary to calculate the amount of underfunding with precision". In short, plaintiffs admit that the agreed statement of facts does not

have complete data to establish exactly the amount of underfunding.

Defendants in attempting to prove that 1977 PA 275 satisfies all constitutional requirements and rectifies any diversion or underfunding offer as proof the general statement following:

"Subsequently, in 1977 PA 275, MCL 38.227; MSA 15.893(27), MCL 38.345; MSA 15.893(85), the Legislature provided funds to pay the unfunded accrued liabilities portion of the MPSERS Chapters I and II 1977-1978 fiscal year retiree payroll in conformity with the writ of mandamus issued by the Court of Appeals. Further, this legislative retrospective reallocation of previously appropriated excess funds, funds derived from the difference between the attained age and entry age methods of actuarial valuation of current service contributions, provides sufficient excess funds to pay the unfunded accrued liabilities portion of the MPSERS Chapters I and II retiree payroll, for the 1974-1975 through 1977-1978 fiscal years, without using funds required for current service contributions under Const 1963, art 9, § 24. Thus, all of the claims made by plaintiffs in their petition for mandamus, concerning the alleged underfunding of the MPSERS Chapters I and II and the use of current service moneys to pay unfunded accrued liabilities during the 1974-1975 and 1975-1976 fiscal years, have been fully addressed by the Legislature in 1977 PA 275, *supra,* and rendered moot." (Footnote omitted.) Defendants-Appellees' Brief, pp 4-5.

This statement, like plaintiffs' proofs, is lacking in definitive figures.

This Court therefore searched the entire record in this case to find the annual appropriations required by the actuaries to properly fund current service reserves, the annual appropriations requested by the Executive to meet the actuaries' requirements and the actual appropriations specifically dedicated by the Legislature to this purpose

as well as the exact amounts made available by 1977 PA 275 and related acts, if any, to determine whether any shortfall due to Executive "borrowing" or legislative underfunding was satisfied by 1977 PA 275 as claimed by defendants. This Court was unable to find data to fulfill this purpose.

Since the missing data presumably are official governmental figures, open to public inspection, this Court then sought through the Court Clerk to locate this data of which it might take judicial notice in order to determine whether indeed 1977 PA 275 did resolve past constitutional problems and render the case moot.

The Court Clerk contacted the MPSERS Board as the most likely source of information with copy of the letters requesting information to defendants. Unfortunately the data produced by this inquiry was inadequate to permit this Court to resolve the remaining legal problems in this case. The inquiry did, however, produce information that the Legislature upon recommendation of the Executive probably underfunded current services during the 1975-1978 fiscal years.[27] Plaintiffs and defendants differ radically as to how much that

[27] Letters in response to specific Court questions from Gerald F. Young, Assistant Attorney General, to Deputy Supreme Court Clerk Jacqueline B. Morse, November 9, 1979, and from James A. White, Counsel for Plaintiffs, to Deputy Supreme Court Clerk Jacqueline B. Morse, November 13, 1979.

This issue was not raised as a question, briefed or argued by the parties. However, it is made material to this case by defendants' argument that 1977 PA 275 satisfies prior "underfunding".

Plaintiffs' argument relative to underfunding was limited to the assertion that the "borrowing" from "post-con" reserves was required because of inadequate provision for "pre-con" pension liabilities. Brief for Plaintiffs, pp 24-25. Defendants, until their letter response of November 9, 1979, maintained that MPSERS was adequately funded with respect to current service. See Answer to Petition for Writ of Mandamus, ¶ 24; Affidavit in Support of Answer, ¶ 16; ¶ 34, dated February 23, 1976; Brief for Defendants-Appellees, pp 3-4, dated September 6, 1978.

The Auditor General's Audit Report for MPSERS, July 1, 1974 through February 28, 1979 indicates on page 44 that the cumulative

underfunding was, however, the shortfall from 1974 to 1978 may have been as high as $207,698,-000.

In this state of the record this Court cannot properly determine whether the Legislature has by 1977 PA 275, and other related acts, if any, satisfied the requirements of Const 1963, art 9, § 24, as defendants aver. Likewise, we cannot determine by what amounts the Legislature has failed to satisfy the requirements of Const 1963, art 9, § 24, if these requirements have not been satisfied.[28]

---

total for requested state funding by the Executive Budget for 1974-1978 was $207,698,000 under the minimum funding requirement of the actuarial valuation. The Legislature appropriated the same amount as the Executive requested.

[28] These determinations could not have been made without answers to all of the following questions on the record. Some few are in the record or judicial notice might be taken of them, but most are not. The questions are:

(1) What specific amount did the actuaries recommend to meet the actuarial requirements for MPSERS "post-con" current service each fiscal year subsequent to the 1963 Constitution to date?

(2) What specific amount did the Executive recommend to the Legislature for the same purpose for the same years?

(3) What specific amount did the Legislature appropriate for the same purpose for the same years?

(4) What accounts for any discrepancy in any year or years between the amount used for current service by the actuaries, the Executive and the Legislature?

(5) What specific amounts to reduce or refund underfunded or "borrowed" current service requirements did the passage of 1977 PA 275 and related acts, if any, provide?

(6) Did the aforementioned funding by 1977 PA 275 and related acts, if any, liquidate all outstanding deficits in current service appropriations? If so, was there any surplus, and if a surplus, how much? If not, what is the amount of the deficit?

(7) Do the actuaries likewise recommend an amount to meet the payment of unfunded accrued liabilities? If the actuaries do not, who does? (a) What specific amount did the actuaries or others recommend to meet the payment of unfunded accrued liabilities each fiscal year subsequent to the 1963 Constitution to date? Likewise (b) what specific amount was recommended by the Executive and (c) what specific amount was appropriated by the Legislature for the same purpose? Finally (d) what was the actual amount required to pay the unfunded accrued liabilities for the corresponding years?

In view of this situation, we remand this matter to the Court of Appeals to make such findings as necessary and such determinations as appropriate.

In passing, we cannot fail to note that separate accounting for the "pre-con" and the "post-con" "current service" reserves of the "out-state" system was terminated on June 30, 1974, and that the two accounts were merged into the pension reserve fund.[29] Obviously these accounts serve different purposes and have different constitutional obligations. It appears that this "merging" continues,[30] but the matter has not been specifically argued. However, it is not beyond plaintiffs' prayer for mandamus against "any * * * public officers or employees who [have not performed their] duties under 1945 PA 136, as amended" to observe that it is questionable whether there could be full compliance with the intent of such legislation and Const

(8) What accounts for any discrepancy in any year or years between the amount used for payment of unfunded accrued liabilities by the actuaries or others, the Executive and the Legislature?

(9) What specific amounts to reduce or refund under-appropriated amounts for payment of unfunded accrued liabilities did the passage of 1977 PA 275, and related acts, if any, provide?

(10) What categories of persons are paid on account of unfunded accrued liabilities, in whole or in part, e.g., MPSERS retirees before adoption of the 1963 Constitution, MPSERS retirees with MPSERS membership both before and after the adoption of the 1963 Constitution, MPSERS retirees with MPSERS membership after the adoption of the 1963 Constitution only and others? If paid only in part, how is that part determined?

(11) Is there any reason why MPSERS cannot be actuarially set up to include all MPSERS members as beneficiaries of current service funding except those who retired prior to the 1963 Constitution?

(12) Is legislation pending to rectify any of the problems outstanding in this case?

[29] It is not of record whether separate accounting for "pre-con" and "current service" reserves of the Detroit system was terminated on June 30, 1974. The Detroit and "out-state" retirement systems were merged on July 1, 1975, pursuant to 1974 PA 259. And see Agreed Statement of Facts, ¶ 32.

[30] Letter in response to specific Court questions from Gerald F. Young, Assistant Attorney General, to Deputy Supreme Court Clerk Corbin R. Davis, October 5, 1979.

1963, art 9, § 24, unless the "post-con" funding accounts are separate and apart from the unfunded accounts; otherwise, it becomes difficult or impossible to ascertain whether there has been a departure from constitutional dedication.

Finally, in the event underfunding is found by the Court of Appeals, it will be necessary for this Court to consider remedies in response thereto. Plaintiffs argued several alternatives in their thoughtful brief, including some which do not require the issuance of mandamus to the Legislature. The non-mandamus remedies focus on the potential implementation of an alleged self-executing allocation to MPSERS in Const 1963, art 9, § 11, and the potential institution of a State Treasury drawing rights priority. Defendants did not respond to the remedies proposed by plaintiffs. Rather, they maintained that the entire relief sought by plaintiffs had been granted by enactment of 1977 PA 275. We have not determined the validity of plaintiffs' arguments as to these possible remedies.

## Conclusion

An historian reviewing the facts of this case would find a dark side and a bright side for retired pensioners.

The dark side would include the facts that: (1) inflation undermines both benefit and funding structures; (2) for fiscal years 1974-1977, the Legislature under-appropriated for "pre-con" unfunded retirees; (3) during that same period, the Executive extralegally "borrowed" from "post-con" funded reserves to pay benefits to "pre-con" unfunded retirees; (4) through its enactment of 1977 PA 275, the Legislature seemed to validate the Executive "borrowing" by the retroactive creation of a tech-

nical surplus of funds through the introduction of a new actuarial system requiring a lower level of early reserves, and (5) for fiscal years 1975-1978, the Legislature may have failed to fully fund "post-con" reserves.

The bright side would include the facts that: (1) during the entire period since the enactment of the 1963 Constitution, every retired pensioner has been paid promised benefits in full and on time; (2) during this same period, the Legislature has actually raised the amount of benefits paid to both "pre-con" and "post-con" retirees; (3) 1977 PA 275, while changing funding systems, substituted an equally sound and viable system for the one replaced—the new funding system would in effect over a period of time restore the "borrowed" funds; and (4) ever since the institution of the new actuarial system by 1977 PA 275, the Legislature has apparently appropriated the "pre-con" benefit payments and has, in effect, promised to continue to do so, thereby observing Const 1963, art 9, § 24, for the "pre-con" unfunded beneficiaries.

While counting such blessings as have come to them, public school employees are understandably still concerned about their pension security. In that regard, this opinion reminds the Legislature that the constitutional provision adopted by the people of this state is indeed a solemn contractual obligation between public employees and the Legislature guaranteeing that pension benefit payments cannot be constitutionally impaired. This opinion also sets forth that neither the Legislature nor the Executive can apply funded reserves to meet unfunded retirement obligations.

It is significant that, when this case pointed out the Constitution had been violated, the Legislature responded voluntarily by taking corrective action.

So, while it is not yet clear whether 1977 PA 275 fully solved all the problems raised in this case, it is clear that in light of the constitutional separation of powers, the retirees' first dependence is on the sense of fairness and justice and the constitutional obligation of the Legislature.

As regards the Executive, this opinion indicates the courts can and will issue mandamus to enforce rights conferred by the 1963 Constitution.

The Court of Appeals decision was correct when issued. However, during appeal to this Court, the Legislature enacted 1977 PA 275. 1977 PA 275 makes the mandamus granted by the Court of Appeals no longer necessary.

Because plaintiffs proved that there was an unconstitutional diversion of monies from the "post-con" current service reserves to pay "pre-con" unfunded accrued liabilities and because defendants defended on the basis that 1977 PA 275 rectified that diversion and "provides sufficient excess funds to pay the unfunded accrued liabilities * * * for the 1974-1975 through 1977-1978 fiscal years, without using funds required for current service contributions" it became incumbent upon defendants to prove their allegations. However, the record does not disclose the data necessary to determine whether the required funds were appropriated as alleged or whether there was an actual shortfall. (See Question V, *supra*). Plaintiffs have in effect prayed to be made whole, and without the necessary data we cannot determine what needs to be done. We therefore remand this matter to the Court of Appeals to make such findings as necessary and to make such determinations and provide such relief as appropriate, consonant with those findings and the holdings of this opinion. The Court of Appeals may appoint a

master to assist in making such findings. We do not retain jurisdiction.

No costs, a public question being involved.

COLEMAN, C.J., and KAVANAGH, LEVIN, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred with WILLIAMS, J.