DURANT v STATE BOARD OF EDUCATION

WATERFORD SCHOOL DISTRICT v STATE BOARD OF
EDUCATION

Docket Nos. 72895, 73245. Argued June 25, 1985 (Calendar Nos. 2, 3).
—Decided December 30, 1985. Released February 11, 1986.

Donald Durant and other residents of the Fitzgerald School
District and the Fitzgerald Public Schools brought an action for
mandamus in the Court of Appeals against the Department of
Education, the Department of Management and Budget, and
the State Treasurer, seeking to compel, under the provisions of
Const 1963, art 9, §§ 25-34, the funding of the Fitzgerald Public
Schools by the state in the same proportion it was funded
during the 1978-79 fiscal year. The Court of Appeals, DANHOF,
C.J., and M. F. CAVANAGH and FREEMAN, JJ., dismissed the
plaintiffs' complaint in an opinion per curiam, holding that the
plaintiffs had not exhausted administrative remedies because
they had not presented their claims before the local govern-
mental claims review board (Docket No. 51431). The plaintiffs
sought leave to appeal in the Supreme Court which, in lieu of
granting leave to appeal, reversed and remanded the case to
the Court of Appeals for consideration of the merits, holding
that the plaintiffs were not required to exhaust administrative
remedies before the board prior to resolution of the legal issues
involved by the Court of Appeals. 413 Mich 862 (1982). On
remand, the Court of Appeals, DANHOF, C.J., and M. F. CAV-
ANAGH and MACKENZIE, JJ., again dismissed the plaintiffs'
complaint, holding that the local government claims review
board should hear the disputed factual questions so that a
suitable evidentiary record could be developed (Docket No.
63901). The plaintiffs appeal.

REFERENCES FOR POINTS IN HEADNOTES

[1] Am Jur 2d, Statutes §§ 38-40, 203-208.
  See the annotations in the ALR3d/4th Quick Index under States.
[2-5] Am Jur 2d, Schools §§ 85 *et seq.*
  See the annotations in the ALR3d/4th Quick Index under Schools;
  States.
[6] Am Jur 2d, Taxpayers' Actions §§ 1-4, 28.
  See the annotations in the ALR3d/4th Quick Index under Taxpay-
  ers' Action.

The Waterford School District and certain members of the Waterford Board of Education, for themselves and as members of the board, brought an action in the Oakland Circuit Court against the State Board of Education and the State Treasurer, seeking a declaration that the defendants were prohibited by Const 1963, art 9, §§ 25-34, from reducing the ratio of state aid to schools from that proportion used in the 1978-79 fiscal year, and injunctive relief and mandamus. The court, Steven N. Andrews, J., granted accelerated judgment in favor of the defendants, holding that the Court of Appeals had exclusive jurisdiction over taxpayers' suits and actions for mandamus against state officers. The Court of Appeals, J. H. GILLIS, P.J., and N. J. KAUFMAN and R. M. MAHER, JJ., reversed and remanded for further proceedings (Docket No. 51344). On remand, the court granted summary judgment for the defendants. The Court of Appeals, BEASLEY, P.J., and M. J. KELLY and LAMBROS, JJ., affirmed in an opinion per curiam (Docket No. 63788). The plaintiffs appeal.

The parties in both cases were directed to consider: (1) whether the term "state law" as used in Const 1963, art 9, § 29 was intended to encompass the provisions of art 8, § 2, requiring free public education; (2) whether there is a minimum level of educational services required by state law within the meaning of art 9, §§ 26-34; (3) the proper interpretation of the term "necessary costs" as used in § 29; (4) whether the state should be allowed to offset any deficiency in funds provided for necessary costs of required activities or services by the amount of any restricted aid being provided to the school district; and, in *Durant,* what judicial procedures should be followed by the Court of Appeals in taking evidence and reaching a decision. 419 Mich 933 (1984).

In an opinion by Justice BOYLE, joined by Justices RYAN, BRICKLEY, and RILEY and Justice CAVANAGH in *Waterford* only, the Supreme Court *held:*

The term "state law" as used in Const 1963, art 9, § 29, means state statutes and state agency rules. The concept of education as provided in Const 1963, art 8, § 2, is not an activity or service required by state statute or state agency rule, and was not intended to be included in the obligation imposed under art 9, § 29 that the state not reduce the state-financed portion of the necessary costs of any activity or service required of local units of government by state law. Unrestricted state aid to school districts is not funding for an existing activity or service required of local units of government by state law and thus need not be maintained at the level pro-

vided during the 1978-79 fiscal year. Only specific, identifiable programs required to be provided by school districts by statute or agency rule are included under § 29.

The term "necessary costs" as used in § 29 means the net cost of an activity or service provided by a local unit of government, *i.e.*, the actual cost the state would incur were it to provide the service or activity, and was intended to provide funding for existing activities or services required of local units of government which are essential or indispensable, rather than merely useful or beneficial. The proportion of such categorical aid may not be reduced below the levels for fiscal 1978-79 for specific requirements imposed by statute or state agency rule.

State funding of all local units of government, taken as a group, is to be maintained at 1978-79 levels.

Taxpayers have standing to bring actions in the Court of Appeals under art 9 to enforce the provisions of §§ 25-31, including cases in which there are disputed facts.

1. Unrestricted state aid to local school districts for the funding of public education is provided by statute through the application of two formulae. The first, intended to remedy inequalities among districts and assure a minimum amount of aid per student, provides funds on a sliding scale. The amount of aid received by a district is dependent upon a ratio of the state equalized valuation of property within the district and the amount of mills levied locally on the valuation for school purposes. The application most frequently results in less aid to districts levying a smaller millage rate and additional aid to districts levying a higher rate. The second provides funds to districts which, because of the high level of local funding and valuation, do not qualify for aid under the first formula. School districts also receive categorical aid for specific activities or services required by statute or agency rule.

2. Const 1963, art 9, § 31 provides that if the equalized valuation of property increases by a percentage greater than an increase in the general price level of the previous year, the maximum authorized school millage rate must be reduced to yield the same gross revenue from existing property as could have been collected under the previous years' rate and prior assessed value. Application of the section has resulted in reduced millage rates where assessed values rose in excess of the rate of inflation as measured by the Consumer Price Index. The reduction, in turn, has resulted in a reduction of state aid under the state aid formulae.

3. Article 9, § 29 provides that the state is prohibited from

reducing the state-financed portion of the necessary costs of any activity or service required of local units of government by state law. "State law" as used in § 29, means state statutes and state agency rules. Section 29 does not require that funding of all constitutionally imposed obligations be maintained at 1978-79 levels. Acceptance of that construction is apposite to the wording of § 29, would require increases in the funding of other services, and would mandate that state taxpayers supplement the school districts of taxpayers with a lower millage rate, results manifestly inconsistent with the ceiling placed on taxes and state revenues by § 29, local control of school districts, and the state's obligation to maintain a balanced budget. Rather, it was intended that any service or activity required by the Legislature or a state agency be funded by the state and not by local taxpayers. Education, as required under art 8, § 2, is not an activity required by statute or agency rule.

4. The phrase "necessary cost" as used in § 29 was intended to provide funding which was essential or indispensable, rather than funding which was merely useful or beneficial. "Necessary cost" means the net cost of an activity or service provided by a local unit of government. The net cost is the actual cost the state would incur were it to provide the activity or service mandated, providing that the actual cost is in keeping with the voters' desire that there be no shift of responsibility for services from the state to the local governments without adequate compensation. Reduction of the proportion of necessary costs below the levels provided in the 1978-79 fiscal year for specific requirements imposed by statute or state agency rule is unambiguously forbidden under § 29. The state may not avoid the requirements of § 29 by specific statutes or by implementation of definitions adverse to its mandate. Thus, use of the provision of the local government disbursement act, MCL 21.233(6)(d); MSA 5.3194(603)(6)(d), to reduce categorical aid below the proportion paid by the state during the 1978-79 fiscal year by requiring school districts to offset any deficiency in categorical aid due them by use of unrestricted aid is clearly violative of § 29.

5. Under Const 1963, art 9, § 30, funding of all units of local government, taken as a group, must be maintained at the levels provided during the 1978-79 fiscal year.

6. Taxpayers have standing to bring actions in the Court of Appeals under art 9 to enforce the provisions of §§ 25-31, including cases in which there are disputed facts. The local government claims review board has jurisdiction only over appeals under art 9 by local units of government.

Justice LEVIN concurred separately except with respect to the

following: 1) so much of subpart II(A) that states that it was not the intent of the voters to include in art 9, § 29 the obligations imposed upon local governmental units by art 8, § 2 and that unrestricted state aid is not funding for an existing activity or service required of units of local government by state law; 2) subpart II(B) where the Court concludes that education is not an activity or service required by state statute or state agency rule; 3) subpart III(A) where the Court concludes that the voters by using the term "necessary" in art 9, § 29 with respect to costs intended to provide funding which was essential or indispensable, rather than that which was merely useful or beneficial.

*Durant,* affirmed in part, reversed in part, and remanded.

*Waterford,* affirmed.

Chief Justice WILLIAMS, dissenting, stated that the convergence of the rollback of property taxes under Const 1963, art 9, § 31 and the operation of the school aid formula prescribed by MCL 388.1621; MSA 15.1919(921) appear to have resulted in the failure of the Legislature to provide the support for education required under art 8, § 2. Thus, the Court should indicate to the Legislature that the school aid formula has fallen short of its intended purpose and leave to the Legislature the task of devising a formula that will maintain and support a system of education to adequately prepare young people for college or employment.

129 Mich App 517; 342 NW2d 591 (1983) affirmed in part and reversed in part.

130 Mich App 614; 344 NW2d 19 (1983) affirmed.

OPINION OF THE COURT

1. CONSTITUTIONAL LAW — LOCAL UNITS OF GOVERNMENT — HEADLEE AMENDMENT — STATE AID — NECESSARY COSTS.

The state is prohibited from reducing the state-financed portion of the necessary costs of any activity or service required of local units of government by state law; state law means state statutes and state agency rules, and necessary costs means the net cost of an activity or service provided by a local unit of government, the actual cost the state would incur were it to provide the activity or service, which is essential or indispensable, rather than merely useful or beneficial (Const 1963, art 9, § 29).

2. SCHOOLS — CONSTITUTIONAL LAW — HEADLEE AMENDMENT — STATE AID.

The concept of education as provided in the Michigan Constitu-

tion is not an activity or service required by statute or agency rule and was not intended to be included in the obligation imposed under art 9, § 29 that the state not reduce the state-financed portion of the necessary costs of any activity or service required of local units of government by state law (Const 1963, art 8, § 2, art 9, § 29).

3. SCHOOLS — CONSTITUTIONAL LAW — HEADLEE AMENDMENT — STATE AID.

Unrestricted state aid to school districts is not funding for an existing activity or service required of local units of government by state law and thus need not be maintained at the level provided during the 1978-79 fiscal year under art 9, § 29 of the Michigan Constitution; only specific, identifiable programs required to be provided by school districts by statute or agency rule are included under the obligation imposed under § 29 that the state not reduce the state-financed portion of the necessary costs of any activity or service required of local units of government by state law (Const 1963, art 9, § 29; MCL 388.1621, 388.1743; MSA 15.1919[921], 15.1919[1043]).

4. SCHOOLS — CONSTITUTIONAL LAW — HEADLEE AMENDMENT — STATE AID.

Categorical aid to school districts for specific, identifiable programs which the districts are required to provide by statute or agency rule may not be reduced below the proportion paid by the state during the 1978-79 fiscal year, such as by requiring districts to offset any deficiency in categorical aid due by use of unrestricted aid (Const 1963, art 9, § 29; MCL 21.233[6][d]; MSA 5.3194[603][6][d]).

5. CONSTITUTIONAL LAW — LOCAL UNITS OF GOVERNMENT — HEADLEE AMENDMENT — STATE AID — NECESSARY COSTS.

State funding of all units of local government, taken as a group, must be maintained at the levels provided during the 1978-79 fiscal year (Const 1963, art 9, § 30).

6. CONSTITUTIONAL LAW — LOCAL UNITS OF GOVERNMENT — TAXPAY-ERS — STANDING — HEADLEE AMENDMENT.

Taxpayers have standing to bring actions in the Court of Appeals under article 9 of the Michigan Constitution to enforce the provisions of §§ 25-31, including cases in which there are disputed facts; the local government claims review board has jurisdiction only over appeals under art 9 by local units of government (Const 1963, art 9, §§ 25-31; MCL 21.240; MSA 5.3194[610]).

*Clark, Hardy, Lewis, Pollard & Page, P.C.* (by *Dennis R. Pollard* and *Timothy K. McConaghy*), for the plaintiffs in *Durant.*

*William G. Wolfram* and *Bruce T. Leitman* for the plaintiffs in *Waterford.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Gerald F. Young* and *James E. Riley,* Assistant Attorneys General, for the defendants.

Amicus Curiae in *Waterford:*

*Hiller, Larky & Hoekenga* (by *Daniel J. Hoekenga* and *Gregory J. Bator*) for Michigan Education Association.

BOYLE, J. We granted leave in these two cases to consider the proper interpretation of specific provisions of the "Headlee Amendment," Const 1963, art 9, §§ 29, 30, and 32.

In *Durant,* the Court of Appeals had originally refused to hear a request for mandamus on the ground that plaintiffs (several taxpayers from the Fitzgerald School District and the Fitzgerald Public Schools), by failing to first obtain a decision before the local government claims review board, had not exhausted their administrative remedies. This Court reversed and remanded, ordering the Court of Appeals to hear the case and ruling that plaintiffs did not need to exhaust their administrative remedies. On remand, the Court of Appeals made several findings, but again dismissed plaintiffs' complaint for mandamus on the basis that the remedy generally will not lie in cases involving disputed facts. The dismissal was without prejudice to plaintiffs' right to go before the local government claims review board for development

of a suitable evidentiary record and a decision in that forum, followed by a judicial review, if the parties were still aggrieved.

In *Waterford,* plaintiffs are the Waterford School District and several taxpayers from the school district as well as members of the Waterford School Board. The suit was originally filed in Oakland Circuit Court, where the trial judge granted summary judgment for the defendants. The Court of Appeals affirmed in light of their holding in *Durant.*

Specifically, our order granting leave to appeal in both cases directed the parties to consider: (1) whether the term "state law" in Const 1963, art 9, § 29 was intended to encompass the provisions of Const 1963, art 8, § 2; (2) whether there is a minimum level of educational services required by state law within the meaning of Const 1963, art 9, §§ 26-34; (3) the proper interpretation of the term "necessary costs" as used in Const 1963, art 9, § 29; (4) whether the state should be allowed to offset any deficiency in funds provided for necessary costs of required activities or services by the amount of any restricted aid being provided to the school district; and (5) what judicial procedures should be followed by the Court of Appeals in taking evidence and reaching a decision in *Durant.*

Defendants in both of these cases are the State Board of Education and the State Treasurer. The Michigan Education Association has filed a brief as amicus curiae.

We conclude that the Court of Appeals reached the correct result in these cases in its substantive findings but erred in some of its reasoning and in its procedural disposition of *Durant.* We affirm in part, reverse in part, and remand *Durant* for further proceedings in light of this opinion.

# I

## FACTS

The issues in this case arise from: A) the fact that the amount of state funding for K-12 education, taken as a whole, has declined since 1978-79, and B) from the further fact that the result of application of two distinct formulae[1] for financing has, as applied, resulted in a reduction of the state-financed proportion of individual school districts' budgets. These two formulae are used to determine the amount of state aid which will be available to school districts during each school year.

Fluctuation in the level of aid given across the board to school districts is evidenced by the trial court's finding in *Waterford* that the overall expenditures for education have not been consistent from year to year. For example, in fiscal year 1979, total state spending was $6,645,331,794. Of that total, 41.61 percent, or $2,764,784,748, went to local governments, and of that local allocation, 52 percent, or $1,454,200,440, went to school aid. In 1980, total state spending was $6,948,356,051, of which 41.62 percent, or $2,891,988,782, went to local units of government, and fifty percent of that amount, or $1,455,097,842, went to school aid.

The reduction of aid to the Waterford School District is the result of the formula adopted by the Legislature in MCL 388.1621; MSA 15.1919(921) (hereafter § 21). This statute currently provides in pertinent part:

> Except as otherwise provided in this act, from the amount appropriated in section 11, there is allocated to each district an amount per member-

[1] Adopted by the Legislature in MCL 388.1621; MSA 15.1919(921) and in MCL 388.1743; MSA 15.1919(1043).

ship pupil sufficient to guarantee the district for 1984-85 a combined state-local yield or gross allowance of $300.00 plus $64.00 for each mill of operating tax levied. For purposes of this section, only taxes levied for purposes included in the operation cost of the district as prescribed in section 7 shall be considered operating tax. The net allocation for each district shall be an amount per membership pupil computed by subtracting, from the gross allowance guaranteed the district, the product of the district's state equalized valuation behind each membership pupil and the millage utilized for computing the gross allowance.

Aid under § 21 is referred to as unrestricted aid. It was designed to remedy possible inequities in the state educational system by providing a sliding scale of funds to "poorer" school districts, *i.e.,* those with a less valuable tax base, to assure a guaranteed minimum amount per student. This formula makes the amount of state aid dependent on the district's state equalized valuation (SEV), *i.e.,* property value and the amount of local mills actually levied, *i.e.,* tax effort, most frequently resulting in less aid to districts with a smaller millage rate and additional aid to those with a higher rate of millage.

Smaller millage rates are now mandated in certain circumstances by Const 1963, art 9, § 31 (the Headlee Amendment), which provides:

Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon. If the definition of the base of an existing tax is broadened, the maximum authorized rate of taxation on the new base in each unit

of Local Government shall be reduced to yield the same estimated gross revenue as on the prior base. If the assessed valuation of property as finally equalized, excluding the value of new construction and improvements, increases by a larger percentage than the increase in the General Price Level from the previous year, the maximum authorized rate applied thereto in each unit of Local Government shall be reduced to yield the same gross revenue from existing property, adjusted for changes in the General Price Level, as could have been collected at the existing authorized rate on the prior assessed value.

The limitations of this section shall not apply to taxes imposed for the payment of principal and interest on bonds or other evidence of indebtedness or for the payment of assessments on contract obligations in anticipation of which bonds are issued which were authorized prior to the effective date of this amendment.

Application of § 31 has resulted in reduced or "rolled back" millage rates when property values (SEV) rose beyond the inflation rate, as measured by the Consumer Price Index. This "rollback" has, in turn, resulted in less state aid under the § 21 formula.

The trial court judge found that in the Waterford School District, the property values (SEV) rose at a greater rate than the rate of inflation (from $448,083,300 in 1978-79 to $531,541,786 in 1979-80 and to $612,968,575 in 1980-81). He further found that this resulted in a "rollback" of the millage rate in Waterford from 30.38 in 1978-79 to 29.6791 in 1979-80 and to 29.7745 in 1980-81 and in a reduction in unrestricted state aid under § 21 from 44.79 percent of the total guarantee per student in 1978-79 to 38.36 in 1979-80.

Plaintiffs in *Durant* claim[2] that the Fitzgerald Public Schools is an "out of formula" school district covered by MCL 388.1743; MSA 15.1919(1043) (hereafter § 143). An "out of formula" school district is one in which the level of local funding and SEV is so high that the district does not qualify for unrestricted state aid under § 21. It may, however, qualify for aid under § 143, which provides:

From the amount appropriated in Section 11, there shall be allocated to each eligible district for 1984-85 the following amount per pupil, except as provided in subsection (2)

(a) Add the following:

(i) 105% of the previous year's membership aid per pupil received under section 21(1).

(ii) 105% of the previous year's membership aid per pupil received under this section.

(iii) 105% of the product of the previous year's state equalized valuation per pupil and the 1975-76 millage levied for purposes included in the operation cost of the district as prescribed in section 7.

(b) From the sum obtained in subdivision (a), subtract the following:

(i) The current year's membership aid per pupil received under section 21(1) or the membership aid per pupil which would be due the district if the current year's formula were applied to the 1975-76 operating millage, whichever is greater.

(ii) The product of the current year's state equalized valuation per pupil and the 1975-76 operating millage levied.

(2) A district shall not receive a greater amount per pupil under subsection (1) than was received by the district in the prior year.

(3) The purpose, use, and expenditure of aid received under this section shall be limited as if

---

[2] As no factual determination was made in the courts below in *Durant*, we use plaintiffs' figures only for illustration of the issues in this case.

the funds were generated by ad valorem taxes levied for operating purposes.[3]

Plaintiffs in *Durant* contend that application of § 143 has resulted in a decline in the amount of state aid from 10.3 percent of the total school budget expenditures in 1978-79 to zero percent in 1981-82, when the Fitzgerald Public Schools was informed that it was no longer eligible for any unrestricted state aid.

Although *Durant* and *Waterford* involve different provisions and formulae for state aid, for the purposes of these cases we may view them as presenting essentially the same issues. Each case involves the issue of permissible post-Headlee reduction in the percentage of aid received from the state by school districts.

## II

### DOES THE HEADLEE AMENDMENT REQUIRE THAT FUNDING TO EACH SCHOOL DISTRICT BE MAINTAINED AT 1978-79 LEVELS?

The first contention of plaintiffs in both *Durant* and *Waterford* is that the state is required by Const 1963, art 9, § 29 (hereafter § 29),[4] to contribute the same percentage of the school operating budget as it did in 1978-79. Section 29 provides:

The state is hereby prohibited from reducing the state financed proportion of the necessary costs of

---

[3] Plaintiffs in *Durant* assert that this section was not designed to equalize disparities in the funds available to state school districts but, rather, was approved by the Legislature to compensate for the school districts' loss of income brought about by the repeal of the personal property tax on inventories.

[4] We begin our analysis directly with § 29 rather than § 25 because it is quite clear that § 25 is merely an introduction to the provisions contained in §§ 26-34 and is not an independent statement of rights or duties.

any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18.

Plaintiffs argue that this provision was intended to cover the constitutional obligation of a free education mandated by Const 1963, art 8, § 2. If we accept plaintiffs' contention, a school district which received fifty percent of its total operating budget in the form of state aid in 1978-79 would be constitutionally entitled to that percentage of their budget in all succeeding years.

The defendants, on the other hand, argue that § 29 applies only to specific requirements imposed on the school districts by state statutes and state agencies. Defendants further argue that this would mean that the state could constitutionally reduce the amount of state aid given to individual school districts below the proportion of the total school budget in 1978-79.

A. *Is the mandate of a free public education in Const 1963, art 8, § 2 an "activity or service required . . . by state law" as set forth in § 29 of the Headlee Amendment?*

The issue here involves the proper interpretation of the term "state law" as it appears in § 29. Plaintiffs claim that the voters intended the term "state law" in § 29 to include constitutional provisions, such as the mandate of a free education in article 8, while the defendants argue that it was intended only to refer to state statutes and state agency rules.

Article 9, §§ 25-34 was presented to the voters under the popular term "Headlee Amendment," named after its original proponent, Richard Headlee. It was proposed as part of a nationwide "taxpayer revolt" in which taxpayers were attempting to limit legislative expansion of requirements placed on local government, to put a freeze on what they perceived was excessive government spending, and to lower their taxes both at the local and the state level.[5]

For the reasons which follow, we hold that it was not the intent of the voters to include in § 29 any obligations that may be imposed upon local governmental units by Const 1963, art 8, § 2 and that unrestricted state aid is not funding for an "existing activity or service required of units of Local Government by state law."

1. The language of the constitution.

In order to determine the proper interpretation of the term "state law" in § 29, we must ascertain the intent of the voters who passed the Headlee Amendment. We begin by looking to the language of the constitution itself.

First, a proper reading of the first two sentences of § 29, in combination with each other, evidences that the correct interpretation of the term "state law" in the section is that asserted by the defendants, *i.e.*, state statutes and state agency rules. The first sentence of § 29 states:

The state is hereby prohibited from reducing the state financed proportion of the necessary costs of

---

[5] See, generally, *Nation's Business,* July 1978, pp 11-12; *Time,* July 17, 1978, p 16; *U S News and World Report,* March 12, 1979, pp 92-94; *Newsweek,* April 9, 1979, p 81; The Detroit News, June 22, 1978, at B1, col 5, August 1, 1978, at A1, col 1, August 30, 1978, at B1, col 5, September 14, 1978, at A22, col 1, July 12, 1978, at B4, col 1, November 1, 1978, at D10, col 3, and November 6, 1978, at BD3, col 1.

any existing activity or service required of units of Local Government by state law.

The second sentence adds:

> A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs.

The first sentence, the one at issue in this case, is aimed at existing services or activities already required of local government. The second sentence addresses future services or activities. Both sentences clearly reflect an effort on the part of the voters to forestall any attempt by the Legislature to shift responsibility for services to the local government, once its revenues were limited by the Headlee Amendment, in order to save the money it would have had to use to provide the services itself.[6]

Because they were aimed at alleviation of two possible manifestations of the same voter concern, we conclude that the language "required by the legislature or any state agency" in the second sentence of § 29 must be read together with the phrase "state law" in the first sentence. This interpretation is consistent with the voters' intent that *any* service or activity required by the Legislature or a state agency, whether now or in the

---

[6] It is clear that the voters' concern with the possibility of the state "shifting responsibility" without adequate state funding would not extend to constitutional provisions. In actuality, the voters themselves determine any constitutional requirements and are fully in control of what will be mandated by the constitution through the ratification process. Const 1963, art 12, § 1 *et seq.*

future, be funded at an adequate level by the state and not by local taxpayers.[7]

Secondly, in other constitutional provisions the term "law" is differentiated from the term "constitution," an indication that distinct and separate references are intended.[8] In fact, the constitutional obligation to provide free public schools in Const 1963, art 8, § 2 itself declares:

> The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law.

These other references in the constitution, coupled with the extensive procedural requirements for placing an amendment such as this one on the ballot, lend further support to a restrictive view of the term "state law." Ballot proposals are carefully scrutinized in this state to eliminate any possibility of confusion.[9] Absent a definite pronouncement that constitutional requirements were to be included under this provision, we are unable to so conclude.

Also we are unable to accept plaintiffs' contention that the last sentence of § 29 shows by negative implication an intention to include constitutional provisions. This sentence provides:

> The provision of this section shall not apply to costs incurred *pursuant* to Article VI, Section 18.[10] [Emphasis added.]

---

[7] This rationale is also consistent with the long-accepted concept of *in pari materia* in statutory construction. *Molony-Vierstra v Michigan State University,* 417 Mich 224; 331 NW2d 473 (1983); *Reed v Secretary of State,* 327 Mich 108; 41 NW2d 491 (1950).

[8] See, *e.g.,* Const 1963, art 7, §§ 26, 34.

[9] See Const 1963, art 2, § 2; MCL 168.474 *et seq.;* MSA 6.1474 *et seq.*

[10] Const 1963, art 6, § 18 states:

"Salaries of justices of the supreme court, of the judges of the court of appeals, of the circuit judges within a circuit, and of the probate

Plaintiffs submit that it is basic that "express mention in a declarative statement of one thing implies the exclusion of other similar things" or, "[s]tated in the opposite context, the express mention of one exclusion implies the inclusion of similar things," *i.e.*, because the last sentence excludes art 6, § 18, other constitutional provisions must be included. Defendants assert, however, that art 6, § 18 does not require any cost to be incurred by a local unit of government and that it is legislative action pursuant to this section or, more simply, state statutes or state agency rules enacted under the general provisions of art 6, § 18, which would give rise to any increased necessary costs.

We agree with defendants. Section 18, like most other constitutional provisions, is not self-executing, and in order for any costs to be incurred there must be further legislation or promulgation of agency rules. Therefore, we find that what is exempted in § 29 is not art 6, § 18, but the legislative and administrative decisions made pursuant to this constitutional mandate. We can only conclude, in the absence of information to the contrary and within the context of this case, that state statutes and state agency rules enacted under art 6, § 18 are not covered by § 29, unlike

judges within a county or district, shall be uniform, and may be increased but shall not be decreased during a term of office except and only to the extent of a general salary reduction in all other branches of government.

CIRCUIT JUDGES, ADDITIONAL SALARY FROM COUNTY

"Each of the judges of the circuit court shall receive an annual salary as provided by law. In addition to the salary received from the state, each circuit judge may receive from any county in which he regularly holds court an additional salary as determined from time to time by the board of supervisors of the county. In any county where an additional salary is granted, it shall be paid at the same rate to all circuit judges regularly holding court therein."

those enacted pursuant to other constitutional provisions. This, then, is the apparent reason art 6, § 18 is specifically mentioned in the last sentence.[11] We find that inclusion of the reference to art 6, § 18, in this case, does not imply that other constitutional provisions are to be included in the provisions of § 29.[12]

2. The effect of including constitutional mandates within the provisions of § 29.

Consideration of the effect of including constitutional provisions within the requirements of § 29 also persuades us that the voters intended the term "state law" to include state statutes and state agencies' rules.

First, if we were to find that § 29 was intended to include the provisions of art 8, § 2, the state's taxpayers would be required to "make up" the difference to any local school district taxpayers who were benefitting from the "rollback" of their

[11] Defendants submit that the specific mention of art 6, § 18 is a reflection of the voters' intent that, should the Legislature require an additional circuit court judge in a county where the board of supervisors have approved supplemental compensation, the state would not be required to also provide the supplemental portion of the new judge's salary.

[12] Plaintiffs in a final argument rely on the Drafters' Notes which were published after the Headlee Amendment had passed. The law is well-settled in both the state and federal courts that comments made after the adoption or passage of a statute or constitutional provision are given little weight when the intent of those who ratified or voted for adoption is manifested otherwise. As the United States Supreme Court stated in *Washington Co v Gunther*, 452 US 161, 176, n 16; 101 S Ct 2242; 68 L Ed 2d 751 (1981): "We are normally hesitant to attach much weight to comments made after the passage of legislation. . . . In view of the contradictory nature of these cited statements, we give them no weight at all." See also *Burdick v Secretary of State*, 373 Mich 578; 130 NW2d 380 (1964). In light of all of the contrary evidence previously discussed and of the fact that our attention is drawn to inconsistencies within the notes themselves, we find the Drafters' Notes of no value in this case. (See Drafters' Note with reference to § 29, which declares in one sentence that state law be broadly construed and in another that this does not guarantee that the proportion of state expenditures paid to a specific school district cannot be reduced.)

millage rate. As the trial court correctly observed in *Waterford:*

> The inequity that arises from this "phantom tax theory" is that Plaintiff school district taxpayers are paying relatively less taxes than those taxpayers in neighboring school districts but would receive the same amount of state aid on a per pupil basis. While their taxing effort is less, in terms of mills levied, their state aid is as great as that of their neighbors. Taxpayers statewide would be subsidizing Plaintiff school district and its taxpayers, the same taxpayers who reaped benefits of the Headlee rollback in their millage.

This, surely, cannot have been the intent of voters, who were striving to gain more control over their own level of taxing and over the expenditures of the state. It is evident that while the voters were concerned about the general level of state taxation, they were also concerned with ensuring control of local funding and taxation by the people most affected, the local taxpayers. The Headlee Amendment is the voters' effort to link funding, taxes, and control. To construe § 29 as plaintiffs suggest would be to force some taxpayers to supplement the school district budgets of others, even if these other taxpayers were enjoying a lower tax rate. In addition, the supplementing taxpayers would have no control over how those funds would be spent, a result which we conclude would be directly contrary to the intent of the voters.

In addition, if this Court were to interpret § 29 as requiring a freeze at 1978 levels on the proportion of the school districts' budgets provided by the state, a great disparity could potentially exist between the level of educational funding for some students as opposed to others. For example, a

school district which was receiving fifty percent of its operating budget in 1978 could continue to increase expenditures and each time would receive one half of the costs from the state. If property values also increased and millage rates were raised, there would be no ceiling on the money that would have to be provided by the state. On the other hand, a district which received twenty-five percent of its budget in 1978 from the state, no matter how the property values declined in succeeding years, would still receive only twenty-five percent in state aid. Each level of decline in money available for the education of students would be matched by a similar decline in state aid.

Such egregious mandated disparities would seriously affect the state's ability to provide the basic necessities for a "free education" to all students, a mandate also passed by the people of Michigan in Const 1963, art 8, § 2. See *Bond v Ann Arbor School Dist,* 383 Mich 693; 178 NW2d 484 (1970). The voters' intent in passing the Headlee Amendment must be viewed, if at all possible, as consistent with other constitutional provisions. *Saginaw Council v Bd of Trustees,* 321 Mich 641; 32 NW2d 899 (1948); *Pontiac School Dist v Pontiac,* 262 Mich 338; 247 NW 474 (1933); *People ex rel Hughes v May,* 3 Mich 598 (1855).

Moreover, were we to accept plaintiff's contentions regarding the meaning of "state law," the voters' desire to curtail spending would be circumvented by the inevitable extension of the requirement to fund constitutional obligations to other areas. If we were to expand the definition of "state law" in § 29, there would be no end to the services which could then expect to have their state funding continually increase with their budgets. These could conceivably include: police and fire services, waste removal, and county prosecutors' offices. See

*City of Ann Arbor v Michigan,* 132 Mich App 132; 347 NW2d 10 (1984). This result is manifestly inconsistent with the ceiling placed on taxes and state revenues by this same constitutional provision and with the state's obligation to maintain a balanced budget,[13] a fact of which the voters were well aware in 1978.

Finally, we are unable to accept plaintiffs' interpretation of the term "state law," because we are not persuaded that the voters intended to adopt a term which would cause both perpetual confusion regarding the "necessary costs" of constitutional obligations (as evidenced by the extensive arguments and proofs offered by plaintiffs in both *Durant* and *Waterford* about the required level of funding) and a high level of state supervision (required to determine whether the district was incurring only "necessary costs"), which would be inconsistent with the historic power of local school boards to decide on curriculum and expenditures. Local control of education is a time-honored tradition in this state and throughout the country.[14]

Sections 1282 and 1300 of the School Code illustrate the authority of local school boards in Michigan to govern their local districts:

---

[13] Const 1963, art 5, § 18. See also Const 1963, art 9, § 28.

[14] The United States Supreme Court found in *Milliken v Bradley,* 418 US 717, 741-742; 94 S Ct 3112; 41 L Ed 2d 1069 (1974):

"No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process. See *Wright v Council of the City of Emporia,* 407 US [451, 469; 92 S Ct 2196; 33 L Ed 2d 51 (1972)]. Thus, in *San Antonio School District v Rodriquez,* 411 US 1, 50 [93 S Ct 1278; 36 L Ed 2d 16] (1973), we observed that local control over the educational process affords citizens an opportunity to participate in decisionmaking, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence.'

"The Michigan educational structure involved in this case, in common with most States, provides for a large measure of local control . . . ."

The board of a school district shall establish and carry on the grades, schools, and departments it deems necessary or desirable for the maintenance and improvement of the schools, determine the courses of study to be pursued, and cause the pupils attending school in the district to be taught in the schools or departments the board deems expedient. [MCL 380.1282; MSA 15.41282.]

The board of a school district shall make reasonable regulations relative to anything necessary for the proper establishment, maintenance, management, and carrying on of the public schools of the district, including regulations relative to the conduct of pupils concerning their safety while in attendance at school or enroute to and from school. [MCL 380.1300; MSA 15.41300.]

The board of education in each of the school districts is directly responsible to the local voters and, with their input, determines what courses will be offered, what the goals of the school system will be, how much teachers will be paid, the number of schools, the requirements for graduation, the number of teachers and administrators, transportation matters, and almost every other matter necessary to the proper running of a school district. See, *e.g.*, *Lintz v Alpena Public Schools*, 119 Mich App 32; 325 NW2d 803 (1982).

Were we to accept plaintiffs' claims, the state would be authorized to determine and fund only what it deemed "necessary," in clear contravention of the tradition of local control. Theoretically, the state could become inextricably involved in every aspect of the school boards' role, determining the number of pencils required on the one hand and computing the necessary teachers' salaries on the other. Such a result is inconsistent with the historic ability of school districts to use funds as they see fit; a system of local control and local accountability is in keeping with the clear

desire of the voters in passing the Headlee Amendment.

3. Conclusion.

We agree with defendants that the language of the constitution itself and the anomalous effect of accepting plaintiffs' proffered definition of "state law" dictate only one interpretation of § 29. We affirm the decision of the Court of Appeals insofar as it determined that the term "state law," as used in Const 1963, art 9, § 29, means state statutes and state agency rules.

B. *Is a free education required by state statute or state agency rule?*

Anticipating our conclusion that "state law" does not encompass constitutional provisions, plaintiffs argue that the 180 days of school contemplated for students in MCL 380.1284; MSA 15.41284 raises education to the level of a service required by state law.

In view of the extensive local control over all other aspects of the educational process and the wording of the statute, we do not find this argument persuasive. Local school boards, as we have already noted, have vast authority to determine the necessary academic and administrative matters which, combined, provide an "adequate education" in those 180 days.

The United States Supreme Court in *San Antonio School Dist v Rodriquez*, 411 US 1, 52, n 108; 93 S Ct 1278; 36 L Ed 2d 16 (1973), rejected a similar argument made by a school district in Texas:

> The State, we are told, regulates "the most minute details of local public education," . . . including textbook selection, teacher qualifications, and the length of the school day. This assertion, that genuine local control does not exist in Texas,

simply cannot be supported. It is abundantly refuted by the elaborate statutory division of responsibilities set out in the Texas Education Code. Although policy decisionmaking and supervision in certain areas are reserved to the State, the day-to-day authority over the "management and control" of all public elementary and secondary schools is squarely placed on the local school boards.

Nor can we conclude, as is urged by amicus curiae, that this Court's decision in *Snyder v Charlotte Public School Dist,* 421 Mich 517; 365 NW2d 151 (1984), establishes that public and parochial schools are required by law to provide a core curriculum. *Snyder* stands for the proposition that *if a district chooses to offer certain courses, it must make them available to all students in the district.*

A recent modification of MCL 388.1621; MSA 15.1919(921) (§ 21), passed by the Legislature on April 9, 1985 (after the decision in *Snyder*), further dispels any indication that the Legislature requires the school districts to offer a core curriculum. Section 21 now provides an additional stipend of $28 per pupil from the state *if* the school board makes available a certain core curriculum including several years of such courses as English, mathematics, and science. This recent pronouncement by the Legislature, offering a "carrot" for compliance, clearly shows that it did not and does not require any district to offer these "core" classes. A core curriculum is not a requirement imposed by state law under § 29.

In conclusion, we find that education is not an activity or service required by state statute or state agency rule.[15]

---

[15] The parties have not argued and we do not decide that there are no mandates on the state to provide for the education of the residents of Michigan or that Const 1963, art 8, § 2 necessarily places any such burdens on local government.

## III

### MAY THE STATE REDUCE FUNDING FOR THE NECESSARY COSTS OF EDUCATIONAL COURSES REQUIRED BY STATE LAW?

Plaintiffs next claim[16] that the state is impermissibly reducing the amount of state aid provided for specific activities or services required of the school districts by state statute or state agency rule (hereafter referred to as categorical aid)[17] by requiring the school districts to offset any deficiency in the categorical aid due to them by the use of funds given to the districts under the unrestricted aid formulae. Defendants urge that this is permissible because of what they claim is the proper definition of the term "necessary costs" in § 29.

A. *Definition of necessary costs.*

A proper determination of this issue again requires us to ascertain the voters' intent when they adopted the wording of § 29. Our specific focus here is on the term "necessary costs" as used in § 29, which reads in pertinent part:

> The state is hereby prohibited from reducing the state financed proportion of the *necessary costs* of any existing activity or service required of units of Local Government by state law. [Emphasis added.]

Plaintiffs urge us to determine that the proper interpretation of the term "necessary costs" is

---

[16] Once again we must reiterate that no factual determination has been made in *Durant.* We address the issues raised by plaintiffs in that case only in illustration of impermissible reductions under the Headlee Amendment. This issue must be dealt with here because of inconsistencies in the holding of the Court of Appeals which leave the proper interpretation of § 29 and MCL 21.233(6); MSA 5.3194(603)(6) in doubt.

[17] See, *e.g.,* MCL 257.811; MSA 9.2511 (driver's education), MCL 380.1502; MSA 15.41502 (health and physical education), MCL 380.1711; MSA 15.41711 (special education).

what is "useful or beneficial," relying on the
United States Supreme Court decision in *McCul-
loch v Maryland,* 17 US (4 Wheat) 316; 4 L Ed 579
(1819). Defendants ask us to adopt a more restric-
tive definition of "necessary costs" and find that
only costs which are "essential or indispensable"
must be provided by the state under § 29. Defen-
dants further urge us to adopt the Legislature's
interpretation of the term found in the implement-
ing legislation for the Headlee Amendment, specif-
ically MCL 21.233(6); MSA 5.3194(603)(6):

> "Necessary cost" means the net cost of an activ-
> ity or service provided by a local unit of govern-
> ment. The net cost shall be the actual cost to the
> state if the state were to provide the activity or
> service mandated as a state requirement, unless
> otherwise determined by the legislature when
> making a state requirement. Necessary cost does
> not include the cost of a state requirement if the
> state requirement satisfies 1 or more of the follow-
> ing conditions:
> (a) The state requirement cost does not exceed a
> de minimus cost.
> (b) The state requirement will result in an offset-
> ting savings to an extent that, if the duties of a
> local unit which existed before the effective date of
> the state requirement are considered, the require-
> ment will not exceed a de minimus cost.
> (c) The state requirement imposes additional
> duties on a local unit of government which can be
> performed by that local unit of government at a
> cost not to exceed a de minimus cost.
> (d) The state requirement imposes a cost on a
> local unit of government that is recoverable from
> a federal or state categorical aid program, or other
> external financial aid. A necessary cost excluded
> by this subdivision shall be excluded only to the
> extent that it is recoverable.

We find that the intent of the voters to lower

taxes and put a ceiling on state spending requires the conclusion that the people intended the common, more limited definition of the word as reflected in the first part of the definition given to the term by the Legislature. Providing only the actual cost to the state, if it provided the service, is in keeping with the voters' desire that there be no shift of responsibility for services from the state to the local governments without adequate compensation. Actual cost in the marketplace is also a reliable measure of what must be paid in order for a service or activity to be provided. We, therefore, affirm the Court of Appeals determination that the voters, in the use of the term "necessary," intended to provide funding which was essential or indispensable, rather than that which was merely useful or beneficial.

B. *Reductions of necessary costs.*

However, in light of our further determination that MCL 21.233(6)(d); MSA 5.3194(603)(6)(d) may improperly reduce the amount of categorical aid given to school districts, we cannot agree *in toto* with the Court of Appeals adoption of the Legislature's definition of "necessary cost." MCL 21.233(6)(d); MSA 5.3194(603)(6)(d) (hereafter § 3[6][d]) provides that "necessary cost" does not include the cost of a requirement if:

> The state requirement imposes a cost on a local unit of government that is recoverable from a federal or state categorical aid program, or other external financial aid.

Plaintiffs and defendants in *Durant* agree that the state is using this provision to reduce the amount of "categorical aid" to some school districts, requiring them to make up the difference through the use of other outside funding, such as unrestricted

aid. Plaintiffs claim that this is a direct violation
of art 9, § 29. Defendants again assert that this is
proper under the legislative interpretation of the
term "necessary costs."

We agree with plaintiffs that, used in this man-
ner, § 3(6)(d) clearly violates the intent of the
Headlee Amendment. The amendment unambigu-
ously forbids state reduction of the proportion of
state aid below the 1978-79 levels for specific re-
quirements imposed by statute or state agency
rule.

Therefore, to the extent that it is used to reduce
categorical aid below the proportion paid by the
state in 1978-79, we find § 3(6)(d) unconstitutional
as applied. The state may not avoid the clear
requirements of art 9, § 29 either by specific stat-
ute or by implementation of definitions adverse to
the mandate of the people.[18]

IV

MUST THE STATE PROVIDE THE SAME LEVEL OF
FUNDING TO SCHOOL DISTRICTS AS A GROUP AS IT DID
IN 1978-79?

In a related issue, plaintiffs also dispute the
state's interpretation of Const 1963, art 9, § 30
(hereafter § 30). Section 30 provides:

[T]he proportion of total state spending paid to
all units of Local Government, taken as a group,
shall not be reduced below that proportion in
effect in fiscal year 1978-79.

---

[18] Plaintiffs in *Durant* in the addendum to their brief also claim
that the state is reducing categorical aid by the use of MCL 388.1621;
MSA 15.1919(921). Because this issue has not been adequately devel-
oped by plaintiffs in this case, we decline the invitation to resolve it
at this time. *Attorney General v Fire Ins Ass'n*, 297 Mich 174; 297
NW 232 (1941).

Plaintiffs urge that this provision means that the aid to each individual unit of government (in this case the school districts) must remain the same proportion of the allotment for local government as it was in 1978. Defendants admit that the state is required to allot the same percentage of their overall state budget to the entire group of local governmental units as they did in 1978, but deny that each school district is entitled to the same pro-rata share of the allotment received in 1978.

The clear language of this provision makes it unnecessary to explore this issue further. *People v Bd of State Canvassers,* 323 Mich 523; 35 NW2d 669 (1949); *Attorney General v State Bd of Assessors,* 143 Mich 73; 106 NW 968 (1906). The term "taken as a group" clearly requires that the overall percentage allotment of the state budget for local units of government must remain at 1978 levels. We decline to accept a strained interpretation of an unambiguous statement of intent by the voters. We affirm the Court of Appeals affirmance of the circuit court's conclusion that § 30 only requires that state funding of all units of local governments, taken as a group, be maintained at 1978-79 levels.

V

How SHOULD THE COURT OF APPEALS DECIDE THE
FACTUAL ISSUES IN *DURANT*?

The final major issue in these cases is the proper procedure to be used in deciding the factual issues in cases brought under Const 1963, art 9, § 32 (hereafter § 32). Section 32 states:

Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals

to enforce the provisions of Sections 25 through 31, inclusive, of this Article and, if the suit is sustained, shall receive from the applicable unit of government his costs incurred in maintaining such suit.

We agree with the Court of Appeals that the section explicitly grants to the taxpayers in *Durant* standing to bring their suit in the Court of Appeals.

However, the Court of Appeals remanded this case to the local government claims review board because the case involved disputed facts. The claims review board was instituted by the Legislature under MCL 21.240; MSA 5.3194(610) (hereafter § 240) to adjudicate claims by local units of government with regard to article 9.

The local government claims review board is not capable, at this time, of adjudicating any claims. The parties do not disagree that it is still in the promulgation process and as yet has not heard or decided a single claim; nor is it ready at this time to do so. Thus, the Court of Appeals remand to the board did not afford a remedy to plaintiffs.

Moreover, the taxpayers who are plaintiffs in *Durant* are correct in their assertion that they have no standing to assert their rights before the claims board because § 240(4) only confers jurisdiction over appeals by a local unit of government. Taxpayers are required to bring an action either in the Court of Appeals or in the circuit court, MCL 600.308a; MSA 27A.308(1).

Where there are disputed facts, as there are in *Durant,* MCL 600.308(a); MSA 27A.308(1), MCR 7.206(D)(3), and GCR 1963, 816.2(2)(c) allow the use of factfinders or special masters who would report their findings to the Court of Appeals. We remand *Durant* to the Court of Appeals for further proceedings consistent with this opinion.

## VI

### IS MANDAMUS A PROPER REMEDY UNDER § 32?

Plaintiffs in *Durant* contend that § 32 authorizes a writ of mandamus, if necessary, to enforce the provisions of article 9. However, we find that this is not the proper case for such a determination.

The factual questions have not been resolved in this case and it is still undetermined if plaintiffs are entitled to relief. To decide on a proper remedy would be premature. As this Court stated in *Washington-Detroit Theatre Co v Moore,* 249 Mich 673, 678; 229 NW 618 (1930):

> Ordinarily the court will refuse a declaration which can be made only after a judicial investigation of disputed facts, especially where the disputed questions of fact will be the subject of judicial investigation in a regular action.

And in *McLeod v McLeod,* 365 Mich 25, 33; 112 NW2d 227 (1961), the Court stated:

> The rights to be adjudicated in a suit for a declaratory judgment or decree extend to such as are in force and effect at the time that the action is brought, or which are bound to arise, or to become fully vested, at some future time.

This is not the case in *Durant,* where a remedy may never be required.

## VII

### DOES THE SCHOOL AID FORMULA VIOLATE THE EQUAL PROTECTION CLAUSE OF THE MICHIGAN CONSTITUTION?

Finally, plaintiffs in *Waterford* ask us to consider whether the school aid formulae violate the

Equal Protection Clause of the Michigan Constitution. We decline to do so as we agree with the Court of Appeals that this issue was not raised in the original complaint. In addition, contrary to plaintiffs' arguments, we find that neither the defendants nor the trial court "injected" the issue into the original proceeding. Ordinarily, this Court does not consider issues raised for the first time on appeal. *Young v Morrall,* 359 Mich 180; 101 NW2d 358 (1960); *Magreta v Ambassador Steel Co,* 380 Mich 513; 158 NW2d 473 (1968).

The judgment of the Court of Appeals is affirmed in *Waterford.* The judgment in *Durant* is affirmed in part, reversed in part, and remanded for a proper determination in light of this opinion.

RYAN, BRICKLEY, CAVANAGH, and RILEY, JJ., concurred with BOYLE, J.

LEVIN, J. I concur except in (i) the last paragraph preceding subdivision 1 of subpart A of Part II, (ii) subpart B of Part II, and (iii) subpart A of Part III.

WILLIAMS, C.J. (*dissenting in part*). I respectfully dissent. I do not here challenge the majority's conclusion regarding the so-called Headlee Amendment, Const 1963, art 9, §§ 25-34, although I cannot fully agree with their analysis. Rather, I write separately to challenge the majority's explication, or lack of explication, of Const 1963, art 8, § 2, the pertinent provisions of the School Code of 1976, MCL 380.1 *et seq.;* MSA 15.4001 *et seq.,* and the school aid formula, MCL 388.1621; MSA 15.1919(921).

Const 1963, art 8, § 2, provides in part:

The legislature shall maintain and support a

system of free public elementary and secondary schools as defined by law.

It is my contention that the Legislature has responsibly attempted to fulfill its obligation to "maintain . . . a system of free public elementary and secondary schools as defined by law." However, the convergence of the art 9, § 31, rollback of property taxes and the operation of the school aid formula appear to have here created an unforeseen situation in which the Legislature is not now providing the constitutionally required "support" under art 8, § 2.[1]

## I

Michigan has always placed a high value on education. Even before statehood, the Northwest Ordinance of 1787 proclaimed what our present constitution reiterates:

> Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged. [Const 1963, art 8, § 1.]

James Blanchard, the Governor of Michigan, has graphically personalized this belief in his January 18, 1984, State of the State address as follows:

> For decades, the promise of education has been the ladder of opportunity in this state. Hard-working people, honest people, lived here or came here, knowing that they themselves could earn a decent living working with their hands—but even more

---

[1] The art 8, § 2 lack of support problem addressed in this opinion is limited to the facts in *Waterford*. In *Durant*, there does not appear to be any allegation that *students* are receiving less than an adequate education. The allegations appear limited to the reduction of the percentage of state aid contrary to the Headlee Amendment.

important, that their children could find an even
better future working with their minds because of
Michigan's fine schools and colleges and universities.

It has been judicially recognized in Michigan for
over three-quarters of a century that public education is a state responsibility. *Attorney General v
Detroit Bd of Ed*, 154 Mich 584, 590; 118 NW 606
(1908); *Child Welfare Society of Flint v Kennedy
School Dist*, 220 Mich 290, 296; 189 NW 1002
(1922); *Lansing School Dist v State Bd of Ed*, 367
Mich 591, 595; 116 NW2d 866 (1962); *Governor v
State Treasurer*, 389 Mich 1, 13-15; 203 NW2d 457
(1972), *vacated* 390 Mich 389; 212 NW2d 711
(1973).

The Constitution of 1908, in a provision similar
to Const 1963, art 8, § 2, required the Legislature
to "continue a system of primary schools . . . ."[2]
This Court interpreted that constitutional mandate in the following terms:

> Fundamentally, provision for and control of our
> public school system is a State matter, delegated
> to and lodged in the State legislature by the
> Constitution in a separate article entirely distinct
> from that relating to local government. The general policy of the State has been to retain control
> of its school system, to be administered throughout
> the State under State laws by local State agencies
> organized with plenary powers independent of the
> local government with which, by location and
> geographical boundaries, they are necessarily
> closely associated and to a greater or less extent
> authorized to co-operate. Education belongs to the
> State. It is no part of the local self-government
> inherent in the township or municipality except so
> far as the legislature may choose to make it such.
> [*MacQueen v Port Huron City Comm*, 194 Mich
> 328, 336; 160 NW 627 (1916).]

[2] Const 1908, art 11, § 9.

In legislation enacted pursuant to the mandate of art 8, § 2, the lawmakers have attempted to provide a workable balance between two important concepts: first, state responsibility for, and support of, education, and second, local management of the schools. Recognizing the vital importance accorded to education by our citizens, the legislators have structured a system in which local officials with day-to-day responsibility for curriculum, transportation, staffing, scheduling and many other matters are directly accountable and directly accessible to the people most affected.

It is for this reason that the Legislature has set forth both general and specific criteria for schools. The School Code contains such general provisions as the following:

Sec. 1281. (1) The state board shall:

* * *

(b) Require each board to maintain school or to provide educational opportunities for resident children for the statutory period. [MCL 380.1281(1)(b); MSA 15.41281(1)(b).]

Sec. 1282. The board of a school district shall establish and carry on the grades, schools, and departments it deems necessary or desirable for the maintenance and improvement of the schools, determine the courses of study to be pursued, and cause the pupils attending school in the district to be taught in the schools or departments the board deems expedient. [MCL 380.1282; MSA 15.41282.]

Sec. 1211. (1) The board of the school district shall vote to levy taxes necessary for school operating purposes to conduct the educational programs authorized by the board. [MCL 380.1211(1); MSA 15.41211(1).]

And such specific directions as:

Sec. 1284. (1) The board of a school district shall

determine the length of the school term. The minimum number of days of student instruction shall be 180. [MCL 380.1284(1); MSA 15.41284(1).]

Sec. 103. (1) A district shall not be allotted or paid a sum under this act for the number of pupils in membership in excess of a ratio of 30 pupils to 1 teacher. The department may include all pupils in membership regardless of this section if in the department's judgment the district could not maintain the ratio because of lack of funds, facilities, or qualified teachers. [MCL 388.1703(1); MSA 15.1919(1003)(1).]

Further, the Legislature created the State Board of Education in part to establish specific regulations such as teacher certification (1981 AACS, R 390.1101 *et seq.*) and a minimum of nine hundred hours of instruction per school year (1984 AACS, R 340.10[5]).

Finally, as testified by Mr. Bruce Rule, supervisor of accounting and finance for the Waterford district: "There is a state aid formula and in that formula the state guarantees you so much per pupil," *e.g.,* 1979 PA 94. This indeed is a prime indicator that the Legislature recognized and intended to honor its responsibility under art 8, § 2, to "support" "a system of free public" education. The school aid formula establishes a minimum guarantee per pupil.

From the above data, it is clear that the Legislature not only understood its responsibility to provide "a system of free public" education, but took the necessary legislative action to respond to that obligation. In part it did so by general directives to a state system of education in the local communities, and in part by very specific directives to the local components of the state system, either in legislation or through the State Board of Education rules and regulations. At the same time, the

Legislature gave to the local communities the task of management of the school districts and schools.

However, this policy judgment favoring local management, which I fully support, should not obscure the fact that education and the "support" of education is the concern of the state under the mandate of art 8, § 2. Nor should it obscure the fact that, although the Legislature has directed the local school boards, by the statutes quoted above, and others, to provide education for children, the ultimate responsibility, particularly for "support," still rests with the state.

## II

It is incontrovertible, then, that the state constitution requires the Legislature to ensure a basic level of education for the children of Michigan. While it may not be possible or appropriate for this Court at this time to state with precision what constitutes a basic level of education, or how much it should cost, I would not hesitate to say that the Michigan Constitution and Legislature contemplate that the public elementary and secondary schools of this state should prepare our children to move into the mainstream through admission to college or the obtaining of employment in industry or commerce after graduation.

That such a standard has been set for the school children of Michigan appears to be well recognized by the State Department of Education. Its *Better Education for Michigan Citizens: A Blue Print for Action* (1984), p v, stated:

> Michigan has a rich history of educational leadership. In the last decade and a half, state-level resources have been developed to assist schools in improving and programming for preschoolers

through adults. Student expectations have been developed for the essential skills of communication, social studies, science, fine arts, health and physical education, and mathematics.

The Michigan Educational Assessment Program, which was one of the first statewide testing efforts in the nation, tests every 4th, 7th, and 10th grade student in reading and mathematics yearly, and tests students on a sampling basis in these other essential skills.

## · III

In *Waterford,* the experienced trial judge found that the reduction in state school aid resulted in conditions that jeopardized students' college admission or preparedness to enter apprenticeships offered by local employers.[3] The court's findings of fact show that the school aid formula in this case failed its intended purpose to "support a system of free public" education.

It is too late to assist the students damaged by this state of affairs. No infusion of funds would now restore to the students their lost opportuni-

---

[3] The circuit court opinion of Judge Steven N. Andrews filed March 29, 1982, includes the following findings of fact:

"It is clear from the evidence that Waterford School District has suffered financial reversals which can be traced to the implementation of the Headlee Amendment, recent school aid legislation, inflation, generally poor economic conditions, declining enrollment, and the unwillingness of the electorate to support millage increases. The confluence of these factors has forced the District to curtail its operations to the extent that loss of accreditation is imminent. For fiscal year 1981-82, the school day has been reduced from six (6) hours to five (5) hours of classroom instruction and course offerings have been dropped. Class sizes have been increased, and teachers laid-off so that the student-teacher ratios do not meet accreditation standards.

"Reductions in classroom hours and curricula may seriously affect Waterford students seeking college admission. Subjects previously taught in the District's schools which could improve a student's chances on the college admission tests have been curtailed.

"In addition to cutbacks in college curricula, vocational course offerings have been reduced. These cutbacks decrease the likelihood that Waterford students can compete for apprenticeships sponsored by local employers."

ties. So there is little use in trying to measure the damage in terms of dollars and cents with a view to restitution, even if there were a way of doing so.

Consequently, mindful of the concerned and responsible action of the Legislature following this Court's decisions in *Shavers v Attorney General,* 402 Mich 554; 267 NW2d 72 (1978), and *Kosa v State Treasurer,* 408 Mich 356; 292 NW2d 452 (1980),[4] I would indicate to that body wherein the school aid formula has fallen short of its intended purpose and leave to the lawmakers the difficult task of devising a formula that will both maintain and support a system of education that will adequately prepare young people for college or employment. Only then will the Legislature have completely fulfilled its constitutionally mandated task of providing a free public education to all the children of Michigan, and no Michigan child will be without an adequate education.

CAVANAGH, J., took no part in the decision of *Durant.*

---

[4] In *Shavers,* this Court held that the no-fault automobile insurance act, 1972 PA 294, failed to satisfy due process in certain specified respects. Our holding was made effective eighteen months from the date of the opinion, in order to allow the Legislature time to amend the act. The Legislature promptly enacted 1979 PA 145 and 147. In response to a remand from this Court, the Wayne circuit judge concluded that the subsequent legislation cured the defects ordered to be cured by *Shavers.* Because there was no further claim of unconstitutionality, this Court affirmed the judgment without considering the merits.

In *Kosa,* plaintiffs sought a writ of mandamus to prohibit the Michigan Public School Employees Retirement Board from using funds derived from current service money to pay accrued unfunded liabilities and to compel the Legislature to appropriate sufficient monies to properly fund the retirement system. The Court of Appeals issued the writ prohibiting the "borrowing" of funds, but held that the judiciary could not compel the Legislature to appropriate funds. 78 Mich App 316; 259 NW2d 463 (1977). In response, the Legislature enacted 1977 PA 275, which retroactively changed the accounting method for the Michigan Public School Employees Retirement System so as to remedy the underfunding.